# Illinois Official Reports

## Appellate Court

*Home Healthcare of Illinois, Inc. v. Jesk*, 2017 IL App (1st) 162482

| | |
|---|---|
| Appellate Court Caption | HOME HEALTHCARE OF ILLINOIS, INC., an Illinois Corporation, Plaintiff-Appellant, v. ROBIN P. JESK, Individually and d/b/a Robin P. Jesk & Associates, Defendant-Appellee. |
| District & No. | First District, First Division<br>Docket No. 1-16-2482 |
| Filed | November 27, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-L-1231; the Hon. Margaret Ann Brennan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Cohn & Cohn, of Chicago (Charles A. Cohn and Erwin Cohn, of counsel), for appellant.<br><br>Brenner, Monroe, Scott & Anderson, Ltd., of Chicago (Amy L. Anderson and Sheldon A. Brenner, of counsel), for appellee. |
| Panel | JUSTICE MIKVA delivered the judgment of the court, with opinion.<br>Presiding Justice Pierce and Justice Simon concurred in the judgment and opinion. |

**OPINION**

¶ 1 The plaintiff in this case, Home Healthcare of Illinois, Inc. (Home Healthcare), brought claims for breach of contract and breach of fiduciary duty against the defendant, attorney Robin Jesk, who served as the escrow agent in a real estate transaction in which Home Healthcare was the buyer and Mr. Jesk's client was the seller. Home Healthcare alleged that Mr. Jesk violated the parties' escrow agreement when he released a $100,000 down payment to the seller without having received a letter from Home Healthcare certifying that all relevant conditions precedent had occurred or been expressly waived by Home Healthcare. The Cook County circuit court granted summary judgment in favor of Mr. Jesk, on the basis that the escrow agreement contained an exculpatory clause making him liable only for "willful misconduct or gross negligence" and Home Healthcare had neither pleaded nor submitted any evidence that Mr. Jesk engaged in such conduct. For the reasons that follow, we affirm.

¶ 2                                    BACKGROUND

¶ 3 Through a series of agreements, Home Healthcare sought to purchase the home health care businesses known as Samland South Healthcare Services, Inc., an Illinois corporation, and Samland Health Care Services, Inc., a Florida corporation (collectively, Samland Healthcare). In one of these agreements, titled "Articles of Agreement for a Deed" (purchase agreement), Home Healthcare, through its president Jason Rivchin, agreed to purchase Samland Healthcare and the property located at 15300 S. Cicero Avenue in Oak Forest, Illinois, from Samland's owner and president, Flora Sampang, for a total of $1.6 million. The purchase agreement detailed a type of seller-financed transaction in which Home Healthcare would pay a down payment of $100,000 at an "initial closing" on August 12, 2010, and maintain possession of the property while making monthly installment payments, plus interest, with a final closing to be held at a later date. Section 3 of the purchase agreement described the nature of the installment payments, after stating "Buyer *has paid* [a] $100,000.00 down payment to Seller upon the initial closing." (Emphasis added.)

¶ 4 The escrow agreement, which is the agreement directly at issue here, expressly incorporated the terms of the purchase agreement as they related to the escrow agent, and provided in relevant part:

"WHEREAS, Buyer shall deposit upon initial closing the down payment in the amount of $100,000.00 (hereinafter referred to as the "Deposit"); and

* * *

WHEREAS, in furtherance of such Transaction, the parties desire and the Escrow Agent is willing to hold the Deposit and Documents in escrow on the terms and conditions hereinafter set forth."

¶ 5 The exculpatory language that the circuit court relied on was as follows:

"7. The Escrow Agent is acting as a Stakeholder only with respect to the Deposit and the Documents. It is agreed that the duties of the Escrow Agent are only as herein specifically provided, and are purely ministerial in nature, and that the Escrow Agent shall incur no liability whatsoever except for willful misconduct or gross negligence. The Seller and the Purchaser each release the Escrow Agent from any act done or

omitted to be done by the Escrow Agent in good faith in the performance of its duties hereunder as Escrow Agent."

¶ 6    The escrow agreement also provided:

"2. The Deposit and Documents, upon delivery to the Escrow Agent, will be directly issued upon closing to Seller after approval of all documentation by Buyer and Buyer's lender to be signed in accordance with the terms of the Agreement and all loan agreements, and; (ii) [*sic*] maintain the Documents, in a safe and secure place within the office of the Escrow Agent as described hereinbelow.

3. When the initial closing of the Transaction takes place, the Escrow Agent shall deliver the Deposit to or upon the Seller, provided the Buyer has executed and delivered to the Escrow Agent a letter certifying that all of the conditions precedent to be performed by Seller set forth in the Agreement between the Seller and the Buyer have been duly satisfied or have been expressly waived by Buyer, which letter shall be delivered personally by Buyer representative Jason Rivchin to the Escrow Agent.

4. In the event the Seller is unable to satisfy the conditions at initial closing, any Deposit held by the Escrow Agent shall be returned to the Buyer by the Escrow Agent, and the Documents shall be returned to the Seller whereupon the Agreement and this Escrow Agreement shall be cancelled and none of the parties hereto shall have any further rights and obligations hereunder, except as provided in the [purchase agreement]."

¶ 7    Section 5 of the purchase agreement explained what was to happen at the initial closing on August 12, 2010. It provided that Home Healthcare, which had taken possession of the property before that initial closing date, would be granted "continued possession at [the] time of [the] initial closing *** provided that the full down payment due in favor of Buyer, [wa]s paid to Seller in cash or by cashier's or certified check on the initial closing date." Section 8(iii)(e) of the purchase agreement provided that "taking possession of the Property" would be "conclusive evidence that [Home Healthcare] in all respects accepts and is satisfied with the physical condition of the Property, all matters shown on the survey and the condition of the title to the Property as shown to him on or before the initial closing."

¶ 8    Paragraphs 5 and 6 of "Rider A" to the purchase agreement further provided that the seller's attorney, Mr. Jesk, would hold in escrow, until a later "final" closing date, both a general warranty deed for the property and the original stock certificates for the business.

¶ 9    Notably, the text of paragraph 2 of the escrow agreement regarding the deposit to be delivered to the escrow agent, as quoted above, is the text of that provision after handwritten changes were made by Mr. Rivchin and initialed by the parties at the initial closing. Paragraph 2 originally provided as follows:

"2. The Deposit and Documents, upon delivery to the Escrow Agent, will be deposited by Escrow Agent into i) for the Deposit, to the [Interest on Lawyers Trust Accounts (IOLTA)] account of Escrow Agent at _____ Bank, if not disbursed to Seller at the initial closing after approval of all documentation by Buyer and Buyer's lender to be signed in accordance with the terms of the Agreement and all loan agreements, and; (ii) maintain the Documents, in a safe and secure place with the office of the Escrow Agent as described hereinbelow."

¶ 10    Home Healthcare alleged in its complaint that its president, Jason Rivchin, delivered to Mr. Jesk at the initial closing on August 12, 2010, a check for $100,000, made payable to Ms. Sampang, but that at no time did Mr. Rivchin or any other representative of Home Healthcare deliver a letter, pursuant to paragraph 3 of the escrow agreement, certifying that all conditions precedent to the purchase agreement had occurred or been waived. Home Healthcare alleged that, by giving Ms. Sampang the check without first receiving the letter required by paragraph 3, Mr. Jesk breached the escrow agreement and, as a result, his fiduciary duty as an escrow agent.

¶ 11    In his answer to the complaint, Mr. Jesk admitted that he agreed to serve as escrow agent for the transaction pursuant to the terms of the parties' purchase and escrow agreements but denied ever receiving a check payable to Ms. Sampang. According to Mr. Jesk, "the deposit of $100,000 was paid by the buyer directly to the seller and was never placed in the hands of the defendant as escrow agent or in any capacity whatsoever." In his responses to Home Healthcare's requests to admit, Jesk further contended that he "was directed by the parties to hold the documents only and the deposit of $100,000 was to go directly to the seller upon the initial closing" on August 12, 2010.

¶ 12    Throughout discovery, the parties adhered to their opposing versions of what took place at the initial closing and professed very different understandings of Mr. Jesk's duties as escrow agent.

¶ 13    At his deposition, Mr. Jesk testified that he is engaged in the general practice of law, with approximately 25% of his work involving real estate transactions but with "[v]ery limited" experience as an escrow agent. In Mr. Jesk's experience, "[t]here was never a reason to hold money in escrow in an articles of agreement deal" like the one at issue here; in such transactions, the initial payment and all subsequent payments are made by the buyer directly to the seller, and only the deed and other relevant documents are held in escrow. As Mr. Jesk explained, "usually a buyer wants the deed held to know that it's available if he fulfills his contractual terms." Mr. Jesk acknowledged that, in those few instances where he has held funds as an escrow agent, he received some documentation authorizing him to release the funds before he did so.

¶ 14    Mr. Jesk testified that, a week or two before the initial closing in this case, he prepared and sent to Mr. Rivchin an initial draft of the purchase agreement, which he based on a form agreement. Although Mr. Rivchin then had the agreement "typed up in another fashion," Mr. Jesk determined that it was "substantially the same" as the form agreement he prepared. Mr. Rivchin, alone or with the assistance of his lawyer, prepared all of the parties' other agreements, including the escrow agreement, and Mr. Jesk only became aware that an escrow agreement would be part of the transaction a few days before the initial closing. Mr. Jesk stated that he received a title report from Mr. Rivchin before the initial closing, ascertained that a mortgage on the property was listed inappropriately, and took action with the lender to have it removed from the report. Mr. Jesk recalled the title report showing "real estate taxes that everybody has" but not any liens against the property. He did not do any investigation regarding the debt status of the property in advance of the initial closing.

¶ 15    Per the parties' agreements, the initial closing was held on August 12, 2012, and was attended by Flora and Alfredo Sampang and Mr. Jesk, for the seller, and by Mr. Rivchin, his mother Julie Rivchin, Mariano Lising, and Wameed and Abdul Yousif, for the purchaser. Mr. Jesk testified that the Sampangs chose to go ahead with the transaction despite his advice to

them that they should not go forward with the deal, which advice was based in part on the fact that the closing had already been delayed and that Mr. Rivchin was suggesting for the first time that the initial deposit of $200,000 be reduced to $100,000.

¶ 16     Mr. Jesk testified that, although he had instructed Mr. Rivchin on the day before the initial closing to wire both the $100,000 down payment and the $4000 in legal fees owed to Mr. Jesk by Ms. Sampang—which Home Healthcare had agreed to pay as part of the deal—to Mr. Jesk's IOLTA account, Mr. Rivchin did not do so. Instead, Mr. Rivchin brought two checks with him to the closing, delivering the one for $4000 to Mr. Jesk and the one for $100,000 directly to Ms. Sampang. Mr. Jesk testified that it was Mr. Rivchin who "really was conducting the closing." Mr. Jesk recalled actually seeing Mr. Rivchin hand the check to Ms. Sampang and stated that this was consistent with his understanding that she would not have signed the purchase agreement—which she did—"if [she] didn't have $100,000 in her hand." In Mr. Jesk's view, this was also consistent with Mr. Rivchin's handwritten change to paragraph 2 of the escrow agreement, which previously stated that the deposit would be deposited into Mr. Jesk's IOLTA account "if not disbursed to [the] Seller at the initial closing," but which Mr. Jesk modified to say "[t]he Deposit and Documents, upon delivery to the Escrow Agent, will be directly issued upon closing to Seller after approval of all documentation by Buyer."

¶ 17     Mr. Jesk acknowledged that he signed the escrow agreement, which he stated "was thrust at [him] the day of the closing." It was his understanding that the portion of the "whereas" paragraph, stating that he was willing to hold a "deposit" in escrow along with the relevant documents, did not apply, as Mr. Rivchin had chosen not to deposit the required funds in Mr. Jesk's account prior to the closing but had, consistent with his modification to paragraph 2 of the escrow agreement, instead brought and delivered a check directly to Ms. Sampang at the initial closing. As Mr. Jesk understood the parties' agreement, paragraph 3 of the escrow agreement would only have applied if, as initially planned, Mr. Rivchin had deposited the $100,000 in Mr. Jesk's IOLTA account in advance of the initial closing. Mr. Jesk would then have required an authorization letter from Home Healthcare at the initial closing to release those funds to Ms. Sampang. Because Mr. Rivchin elected not to deposit the $100,000 in the IOLTA account but instead to bring a check directly to the closing, Mr. Jesk believed that there was no "deposit" for him to hold in escrow. When asked why he did not strike out references to a deposit in paragraph 3 of the escrow agreement or elsewhere in the parties' agreements, Mr. Jesk explained:

> "A. When somebody brings [documents] in en masse [*sic*] on the day of a closing that's been long delayed, some of them don't get the attention that they should in terms of striking out irrelevant and impertinent information that should be stricken out.
>
> There's no reason to strike out deposit, deposit, deposit, if the agreement says itself that there is no deposit. That it's given directly to the seller."

¶ 18     Mr. Jesk testified that other language in the agreements signed at the initial closing on August 12, 2010, was not applicable to the transaction. For example, paragraph 2 of the escrow agreement also called for documentation to be provided to Home Healthcare's lender, but this was a seller-financed transaction, and Home Healthcare had no lender.

¶ 19     Mr. Jesk acknowledged in his deposition that he never received a letter, as referenced in paragraph 3 of the escrow agreement, from Home Healthcare stating that all conditions precedent to the release of the $100,000 had been satisfied. But as Mr. Jesk understood his responsibilities under the parties' agreements, he was only required to maintain in a safe and

secure place after the initial closing the warranty deed from the seller to the buyer, the stock certificates to the two corporations that were part of the sale, and the parties' original signed documents, which he did. It was his understanding that, "[i]f all of [the parties'] agreements were read, agreed to and signed, the hundred thousand [dollars] would be given to Flora Sampang." In Mr. Jesk's view, any ambiguity in the escrow agreement was resolved by the language of the purchase agreement, which made clear that the $100,000 was to be paid to the seller simultaneously with the signing of all of the parties' various agreements at the initial closing. If the money was not paid there and then, according to Mr. Jesk, "everyone would have walked out of the room without a closing."

¶ 20    Mr. Rivchin's deposition testimony described the closing differently than Mr. Jesk's. Mr. Rivchin testified at his deposition that the deal was originally intended to be "just a straight purchase and sale," in which Home Healthcare would receive financing from a lender to purchase the property, but after several delays and Ms. Sampang's failure to "provide[ ] everything she needed to for the lender," the parties instead began to structure the deal around articles of agreement for a deed, a type of transaction with which Mr. Rivchin had no prior experience. According to Mr. Rivchin, Mr. Jesk stated at the initial closing that he did not want to hold any funds in his IOLTA account and instructed Mr. Rivchin and the other buyer's representatives to leave and bring back separate checks for $100,000 and $4000. Mr. Rivchin stated that they did as they were instructed and, upon returning, Wameed Yousif, Home Healthcare's sole shareholder, "actually handed both [checks] to Mr. Jesk" as the parties sat back down. When asked if he saw Mr. Yousif physically hand the checks over, Mr. Rivchin stated: "We all did, to Mr. Jesk directly."

¶ 21    Mr. Rivchin acknowledged that the purchase agreement called for the $100,000 to be paid to the seller at the initial closing. However, it was his position that paragraph 3 of the escrow agreement, which was drafted by Mr. Rivchin's attorney and stated that the money could not be released until all conditions precedent were satisfied, was controlling. Mr. Rivchin also acknowledged that he modified paragraph 2 of the escrow agreement as described above. He denied, however, that his signing of the purchase agreement at the initial closing constituted his "approval of all documentation," as contemplated in that paragraph. In his view, the initial closing remained open-ended while Home Healthcare tested "its ability to move forward in the ownership," and it was Mr. Jesk's duty to hold the check for $100,000, until told otherwise.

¶ 22    When Mr. Rivchin was asked to comment on section 5 of the purchase agreement, which made continued possession of the property contingent upon payment of the $100,000 at the initial closing, he indicated that, in his view, the initial closing did not really conclude when the parties parted ways on August 12, 2010:

> "Q. So in order to stay in possession of the business and to conduct the business of Samland South, the down payment needed to be made at the initial closing?
>
> A. Yes and no. Again we had to get past the initial closing, but we never really did because we never got past the issues ***.
>
> So that's why we never could provide Mr. Jesk a release as far as a letter confirming that all the conditions had been satisfied. So that's why we sat in this sort of really awkward position where we didn't have this control over the business. And we really didn't have the ability to move forward in the ownership. We never got past the issues and more just kept coming."

¶ 23    According to Mr. Rivchin, after the initial closing Home Healthcare encountered some difficulties taking over management of Samland Healthcare and became concerned with issues raised in the companies' corporate minutes. Mr. Rivchin testified that a meeting was eventually held with Mr. Jesk, at which "there were a number of acknowledgments of a lot of wrongdoing and a lot of problems," including undisclosed debts for which the business had been pledged as collateral. Through further negotiations, Home Healthcare ultimately "walked [away] from the business." According to Mr. Rivchin, it was not until this time that Home Healthcare learned that the $100,000 down payment had already been paid to Ms. Sampang.

¶ 24    The record also includes the depositions of the parties' expert witnesses, who offered their own opinions, as attorneys with experience in transactional real estate, regarding the proper construction of the parties' agreements and whether an escrow agent would be in violation of those agreements under various hypothetical scenarios. There is no need to summarize that testimony here, as these opinions are not a proper subject for expert opinion, at least in reference to the issues before us on this appeal. See *Caracci v. Patel*, 2015 IL App (1st) 133897, ¶ 28 ("It is well settled that an expert witness may not testify with respect to legal conclusions.").

¶ 25    Mr. Jesk moved for summary judgment pursuant to section 2-1005 of the Code of Civil Procedure (735 ILCS 5/2-1005 (West 2016)), arguing that Home Healthcare had failed to plead or present any evidence supporting a finding that Mr. Jesk acted with "willful misconduct or gross negligence," as provided in the exculpatory clause in paragraph 7 of the escrow agreement. Mr. Jesk raised other provisions in the purchase agreement and escrow agreement, particularly the handwritten change to paragraph 2 of the escrow agreement made by Mr. Rivchin, that he argued rendered the escrow agreement's references to a deposit to be held in escrow ambiguous. Because Mr. Jesk reasonably and "firmly believe[d] that he was in compliance with his duties as escrow agent in th[e] deal," he insisted that the most Home Healthcare could argue "was that [he] made a mistake in his interpretation of the contracts in this transaction" and thus was not liable in light of the exculpatory language in paragraph 7 of the escrow agreement.

¶ 26    In response, Home Healthcare focused on paragraphs 3 and 4 of the escrow agreement, arguing that the $100,000 check was "deposited" with Mr. Jesk, that he was not provided with a letter from Home Healthcare releasing the check to Ms. Sampang, and that nothing excused Mr. Jesk from returning the money to Home Healthcare. Home Healthcare insisted that the exculpatory clause found in paragraph 7 of the escrow agreement could not protect Mr. Jesk from liability because this was a breach of contract case, "not a negligence case or a malpractice case," and "negligence [wa]s not an issue."

¶ 27    In his reply, Mr. Jesk reiterated that the escrow agreement incorporated by reference and was to be read in conjunction with the purchase agreement. He argued that any requirement for him to hold the $100,000 check in escrow beyond the initial closing contradicted numerous provisions in the purchase agreement and the escrow agreement providing that the payment was to be made directly to the seller at the initial closing. Mr. Jesk urged the circuit court to conclude that the limitations on liability in paragraph 7 of the escrow agreement did apply and that summary judgment in Mr. Jesk's favor was appropriate where Home Healthcare failed to plead or to present any evidence supporting a finding that Mr. Jesk acted with gross negligence or willful misconduct as to his contractual obligations. Mr. Jesk maintained that he simply "reviewed the instructions of a poorly worded and specifically modified Escrow Agreement in

conjunction with the original agreement, and acted in accordance with the intentions of the parties," as he understood them.

¶ 28      At oral argument on Mr. Jesk's motion for summary judgment, counsel for Home Healthcare maintained that, on a claim for breach of contract, the notion of willful and wanton conduct was "sort of a figment of [Mr. Jesk's] imagination" but argued in the alternative that, if the concept applied, it was an affirmative defense that Mr. Jesk had the burden of proving.

¶ 29      The circuit court granted Mr. Jesk's motion, concluding that summary judgment in Mr. Jesk's favor was proper because not only had Home Healthcare failed to plead "that Mr. Jesk acted in a willful manner in his capacity as the Escrow Agent" but there was "no evidence at all" that he had so acted. The circuit court stated: "It is the [plaintiff's] burden to bring forth everything in order to defeat that summary judgment. Simply it has not been met, and therefore judgment will be entered in favor of the defendant." Home Healthcare now appeals.

¶ 30                                JURISDICTION

¶ 31      The circuit court entered its final judgment in this case on August 4, 2016, and Home Healthcare timely filed its notice of appeal on September 1, 2016. We have jurisdiction under Illinois Supreme Court Rules 301 and 303 governing appeals from final judgments. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. Jan. 1, 2015).

¶ 32                                  ANALYSIS

¶ 33      We review a grant of summary judgment *de novo* (*Doria v. Village of Downers Grove*, 397 Ill. App. 3d 752, 756 (2009)) and may affirm "on any basis appearing in the record" (*Urban Sites of Chicago, LLC v. Crown Castle USA*, 2012 IL App (1st) 111880, ¶ 21). Summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2016).

¶ 34      On appeal, Home Healthcare argues that the circuit court's grant of summary judgment in Mr. Jesk's favor based on the exculpatory clause in paragraph 7 of the parties' escrow agreement was erroneous because that clause only limits Mr. Jesk's liability for tortious conduct and has no application on this claim for breach of contract. Home Healthcare also argues that, if the exculpatory clause does apply, it is an affirmative defense on which the circuit court improperly shifted the burden of proof from Mr. Jesk to Home Healthcare. While we agree with Home Healthcare that the exculpatory clause may be an affirmative defense, we agree with the circuit court that summary judgment in favor of Mr. Jesk was proper.

¶ 35                    1. The Exculpatory Clause Is an Enforceable Limit on Contract Liability

¶ 36      It is clear from the parties' briefs that contested issues of fact exist concerning who physically handed the $100,000 check to Ms. Sampang and whether Mr. Jesk failed to comply with paragraph 3 of the escrow agreement. However, for purposes of Mr. Jesk's motion for summary judgment, these are not *material* issues of contested fact. See *Heiden v. Cummings*, 337 Ill. App. 3d 584, 588 (2003) (noting that "facts which would not affect the outcome of a party's case, regardless of how sharply those facts are controverted, will not warrant the denial of a motion for summary judgment" (internal quotation marks omitted)). The sole argument

Mr. Jesk made in his motion was that, as a matter of law, *even if* he had a duty to hold the check beyond the initial closing and *even if* he breached that duty under paragraph 3 by giving the check to Ms. Sampang without having first received an authorization letter from Home Healthcare, the exculpatory clause at paragraph 7 of the escrow agreement shielded him from liability. Although this position is inconsistent with Mr. Jesk's insistence that he could not have breached the agreement because the $100,000 check was never given to him in the first place, it is well established that a defendant may assert inconsistent defenses in the alternative. See, *e.g.*, *People v. Ford*, 39 Ill. 2d 318, 320-21 (1968) (holding a defendant may deny doing the act giving rise to a criminal charge and simultaneously argue that, even if she did do it, she should be found not guilty by reason of insanity); *People v. Norfleet*, 29 Ill. 2d 287, 290-91 (1963) (finding a defendant may deny that he made incriminating statements and simultaneously challenge the voluntariness of those statements).

¶ 37    On appeal, we are concerned only with whether the exculpatory clause at issue can be applied in the context of a claim for breach of contract and, if it can, whether there is a contested issue of fact as to whether Mr. Jesk's conduct fell outside the protections of that clause.

¶ 38    Paragraph 7 of the escrow agreement contains two sentences purporting to exculpate Mr. Jesk from liability. The first states that "the Escrow Agent shall incur no liability whatsoever except for willful misconduct or gross negligence." The second provides that "[t]he Seller and Purchaser each release the Escrow Agent from any act done or omitted to be done by the Escrow Agent in good faith in the performance of its duties hereunder."

¶ 39    Home Healthcare argues that exculpating Mr. Jesk from liability for anything that is not "willful misconduct or gross negligence" makes his obligations under the contract illusory. Although Home Healthcare does not cite the case directly, its argument touches on principles articulated by our supreme court in *Jewelers Mutual Insurance Co. v. Firstar Bank Illinois*, 213 Ill. 2d 58 (2004). In *Jewelers*, a clause in a bank's safety deposit box rental agreement purported to exculpate the bank from all liability for loss or damage to the boxes' contents. *Id.* at 63. But in the very next sentence of the agreement the bank expressly assumed a duty to exercise ordinary care to prevent the unauthorized opening of the boxes. *Id.* Concluding that the clauses could not be reconciled, the court in *Jewelers* held that the exculpatory clause was unenforceable. *Id.* at 64-65. *Jewelers* stands for the principle that "[a] party cannot promise to act in a certain manner in one portion of a contract and then exculpate itself from liability for breach of that very promise in another part of the contract." *Id.* at 65.

¶ 40    In the escrow agreement at issue here, Mr. Jesk promised to undertake certain duties. If an exculpatory clause in that same agreement categorically shielded Mr. Jesk from liability for any breach of that promise, we agree with Home Healthcare that the clause would render the contract illusory and, under *Jewelers*, could not be enforced. But it is clear that the exculpatory clause in paragraph 7 of the escrow agreement does not make Mr. Jesk's promises illusory. The net effect of the two relevant sentences in that clause is that Mr. Jesk is not liable for acts of ordinary negligence committed in good faith but *is* still liable for actions taken in bad faith, *i.e.*, acts constituting "willful misconduct or gross negligence." Applied to a claim for breach of contract, the clause shields Mr. Jesk from liability for accidental or negligent breaches of contract, but not from intentional breaches or breaches resulting from gross negligence. The clause does not run afoul of the prohibition in *Jewelers* against exculpatory clauses that render contractual promises illusory. Indeed, the court in *Jewelers* distinguished a decision of the

Florida appellate court on this basis, nothing that the clause in that case—which limited liability to "instances of gross negligence, fraud, or bad faith," was only a "partial exculpatory clause" that did not completely absolve the defendant of liability under the parties' contract. *Id.* at 68 (citing *Federal Deposit Insurance Corp. v. Carré*, 436 So. 2d 227, 229-30 (Fla. Dist. Ct. App. 1983)).

¶ 41   Moreover, although it is true that "exculpatory provisions do not enjoy special favor in the law" (*Meyers v. Rockford Systems, Inc.*, 254 Ill. App. 3d 56, 62 (1993)), they are generally upheld "unless (1) it would be against a settled public policy of the State to do so, or (2) there is something in the social relationship of the parties militating against upholding the agreement" (internal quotation marks omitted) (*Harris v. Walker*, 119 Ill. 2d 542, 548 (1988)). Home Healthcare does not argue that paragraph 7 of the escrow agreement violates either of these principles.

¶ 42   Home Healthcare insists that the phrase "willful misconduct and gross negligence" used in paragraph 7 of the escrow agreement references tort concepts that simply cannot be applied in the context of a claim for breach of contract. In support of this argument, Home Healthcare relies on certain statements made by our supreme court in *Valfer v. Evanston Northwestern Healthcare*, 2016 IL 119220. We find Home Healthcare's reliance on those statements to be misplaced.

¶ 43   The plaintiff in *Valfer* was a doctor whose privileges to practice at the defendant hospital were revoked by the hospital's peer review board. *Id.* ¶ 1. The doctor alleged, among other things, that the hospital violated its own bylaws by failing to reinstate him. *Id.* The hospital moved for summary judgment, arguing that it was immune from damages under a provision of the Hospital Licensing Act (210 ILCS 85/1 *et seq.* (West 2012)), which provides that hospitals are not liable for civil damages resulting from the acts or omissions of their review boards, except those acts "involving wilful or wanton misconduct." *Valfer*, 2016 IL 119220, ¶¶ 1, 23 (citing 210 ILCS 85/10.2 (West 2012)). The doctor argued that the review board's conduct was willful because revocation of the doctor's privileges was an intentional act that the board knew would cause him harm. *Id.* ¶¶ 21, 26. Our supreme court disagreed, concluding, as the appellate court did, that elsewhere in the same provision the legislature had provided a much narrower definition of "wilful and wanton misconduct," clarifying that the exculpatory provision did not apply only where the "harm" intended by a defendant was physical harm. *Id.* ¶ 25. Because the doctor alleged no physical harm, the hospital was not liable for damages stemming from the board's decision. *Id.* ¶¶ 16, 25.

¶ 44   Home Healthcare completely overlooks both the facts and holding of *Valfer* and instead seizes on statements the court made after it announced its holding, in which it acknowledged that the language in the statute was not "flawless" because it "incongruously engrafted" tort concepts onto a statute providing immunity for contract claims. *Id.* ¶ 27. The court noted both that " 'wilful and wanton' is a tort concept that applies only to reckless or intentionally tortious conduct that causes physical harm to a person or property" and that the concept generally "has no application to a nontort claim such as a routine breach of contract." *Id.* However, in making this observation, the court did not, as Home Healthcare suggests, hold that tort concepts can *never* be used to define the boundaries of a party's immunity for breach of contract. In fact, our supreme court in *Valfer* referenced *Morrow v. L.A. Goldschmidt Associates, Inc.*, 112 Ill. 2d 87 (1986) (see *Valfer*, 2016 IL 119220, ¶ 27 n.4), a case in which it recognized that a breach of contract may by willful and wanton and went on to hold that, as a matter of public policy,

- 10 -

punitive damages are not available for willful and wanton breaches of contract, except where the conduct constituting the breach is also the basis for an independent tort claim. *Morrow*, 112 Ill. 2d at 94, 98-99. Home Healthcare also relies on *Morrow*. However, again, nothing in that case suggests that there can be no such thing as a willful and wanton breach of contract. Rather, our supreme court held in that case that such a breach will not give rise to punitive damages.

¶ 45 Neither *Valfer* nor *Morrow* offers any support for Home Healthcare's argument that a contractual provision that purports to exculpate parties from liability for all breaches of contract except those involving bad faith, willful misconduct, or gross negligence is not enforceable. Home Healthcare has provided us with no other authority suggesting that parties lack the ability to agree to limit contract liability to such conduct. Indeed, because "[p]ublic policy strongly favors freedom to contract" (internal quotation marks omitted) (*Harris*, 119 Ill. 2d at 548), we see no reason why parties should not be free to agree to such provisions.

¶ 46 In fact, Mr. Jesk cites several cases in which this court has upheld exculpatory provisions, like the one at issue here, that limit contract liability based upon the nature of a party's conduct. For example, in *Meyers*, 254 Ill. App. 3d at 62-63, this court upheld an exculpatory provision that relieved an escrow agent from any liability for surrendering stock in the event that the plaintiff defaulted in making contractually required installment payments, unless the agent "failed to act in good faith in making that surrender." And in *Axelrod v. Giambalvo*, 129 Ill. App. 3d 512, 516, 519 (1984), we upheld an exculpatory clause in a trust agreement that protected trustees from liability for breach of their duties under that agreement, so long as they operated "in good faith and with reasonable care." These cases are consistent with our supreme court's recognition in *Jewelers* that partial exculpatory clauses limiting a party's liability to "instances of negligence, fraud, or bad faith" do not completely and impermissibly foreclose contract liability. *Jewelers*, 213 Ill. 2d at 68 (citing *Carré*, 436 So. 2d at 229-30). While the facts of the cases Mr. Jesk relies on are different than this one in that the good-faith errors at issue there were not, as Mr. Jesk claims to be the case here, possible good-faith misinterpretations of a party's contractual responsibilities, those cases make it clear that Illinois does recognize the right of parties to agree to limit their contract liability.

¶ 47 Courts in other states have gone a step further, to expressly recognize that an exculpatory clause may protect a party to a contract from liability when the party relies on its own good-faith misunderstanding of what the law provides. In *New Mexico v. Colonial Penn Insurance Co.*, 812 P.2d 777 (N.M. 1991), for example, the State of New Mexico sued its investment firm for breach of contract for recommending to the state's investment officer that he purchase certain stocks prohibited by the state's constitution. *Id.* at 782. The New Mexico Supreme Court concluded that a claim for breach of contract against the firm was cognizable because the contract should be read to include a requirement that all recommended purchases were legal. *Id.* at 784. However, a clause in the contract exculpated the firm from liability except for actions constituting " 'knowing willful misfeasance, bad faith, or reckless disregard,' " and the court concluded that summary judgment was not proper because contested issues of material fact existed with respect to whether the investment firm's conduct rose to that level, "including whether [the firm] had notice of the constitutional limitations" that the state's purchases were subject to. *Id.*

¶ 48 In short, we conclude that paragraph 7 of the parties' escrow agreement constitutes an enforceable limitation on Mr. Jesk's liability for breach of contract and reject Home Healthcare's suggestion that it is not a limitation that the parties were entitled to agree to as

- 11 -

part of their escrow agreement or that it has no meaning in the context of the claim against Mr. Jesk.

¶ 49                    2. Home Healthcare Failed to Meet Its Burden of Producing
                       Some Evidence of Willful Misconduct or Gross Negligence

¶ 50    Home Healthcare also argues that, even if the exculpatory clause is enforceable in the context of a contract claim, by granting summary judgment in favor Mr. Jesk based on Home Healthcare's failure to plead or present evidence of willful misconduct or gross negligence, the circuit court "wrongfully shift[ed] the burden of proof, as to what is essentially an affirmative defense, from the defendant to the plaintiff."

¶ 51    What Home Healthcare fails to recognize in this second argument is that on a motion for summary judgment, although the burden of *persuasion* remains with the moving party, the burden of *production* can shift. See *Moline School District No. 40 Board of Education v. Quinn*, 2016 IL 119704, ¶ 44 (noting that the movant in that case "bore the burden of persuasion, as well as the *initial* burden of production" (emphasis added)). A defendant who moves for summary judgment can meet its initial burden of production by either (1) affirmatively introducing evidence that, if uncontroverted, would disprove the plaintiff's case (see *Purtill v. Hess*, 111 Ill. 2d 229, 240-41 (1986)) or (2) establishing that a lack of sufficient evidence will prevent the plaintiff from proving an essential element of the cause of action (see *Willett v. Cessna Aircraft Co.*, 366 Ill. App. 3d 360, 368 (2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986))). Where a defendant meets its initial burden of production, that burden shifts to the plaintiff to show some factual basis to support the elements of his claim or to defeat the defense. *Soderlund Brothers, Inc. v. Carrier Corp.*, 278 Ill. App. 3d 606, 615 (1995).

¶ 52    An affirmative defense is some "other affirmative matter" by which a party "seeks to avoid the legal effect of or defeat the cause of action set forth in [a] complaint, counterclaim, or third-party complaint." 735 ILCS 5/2-613(d) (West 2016). Although Mr. Jesk did not assert paragraph 7 of the escrow agreement as an affirmative defense in his answer, Home Healthcare acknowledges that "an affirmative defense may be raised in a motion for summary judgment even though it had not been raised previously in the pleadings." *A.C. Cannon v. Bryant*, 196 Ill. App. 3d 891, 894 (1990). We agree with Home Healthcare that it may be appropriate to view an exculpatory clause as an affirmative defense. See *Meyers*, 254 Ill. App. 3d at 66 (concluding that the exculpatory clause in an escrow agreement constituted an "affirmative matter[ ], evident from the pleadings, which defeated or negated [the] plaintiff's claim" against the escrow agent for breaching his duties under the agreement).

¶ 53    However, we do not agree that the circuit court improperly shifted the burden to Home Healthcare on this issue. Although the burden of proof at trial on an affirmative defense would ultimately be Mr. Jesk's, his burden of production, as the party moving for summary judgment, would properly shift to Home Healthcare if he presented evidence supporting his factual position on that affirmative defense. *Soderlund*, 278 Ill. App. 3d at 615 ("Once the movant has carried this burden, the respondent may not rely on the factual issues raised by the pleadings, but must submit affidavits or refer to depositions or admissions on file which present" "a factual basis which would arguably entitle them to judgment in their favor, based on the applicable law." (Internal quotation marks omitted.)).

¶ 54    The record reflects that Mr. Jesk met his initial burden of production on the exculpatory clause by presenting evidence that his actions did not constitute "willful misconduct or gross negligence." In support of his motion, Mr. Jesk pointed to provisions in the purchase agreement, "Rider A" to that agreement, and Mr. Rivchin's handwritten change to the escrow agreement itself, all calling for the $100,000 down payment to be paid directly to Ms. Sampang at the initial closing. Section 5 of the purchase agreement further provided that continued possession of the property by Home Healthcare beyond the date of the initial closing was expressly conditioned on that payment being made at the initial closing. Paragraphs 5 and 6 of "Rider A" referred only to Mr. Jesk holding the general warranty deed and original stock certificates in escrow, not the payment of $100,000. And although paragraph 3 of the escrow agreement provided that Mr. Jesk should only deliver the deposit to Ms. Sampang upon receipt from Home Healthcare of a letter certifying that all conditions precedent to the transaction had occurred or were waived, paragraph 4 immediately following it provided that the conditions were to be satisfied "*at closing*" (emphasis added). If they were not, the deposit was to be returned to the buyer, and there would be no deal. Mr. Jesk and Mr. Rivchin both testified that the deal was in fact not called off at the initial closing; the parties left with signed copies of the various agreements, and Home Healthcare continued to possess the property.

¶ 55    Mr. Jesk and Mr. Rivchin also both testified that the parties initially planned for the $100,000 to be deposited in Mr. Jesk's IOLTA account. Although they disagreed regarding what led them to change that plan, it is undisputed that no deposit was made into the account. Instead, both parties agree that Mr. Rivchin brought a check with him to the initial closing and made a handwritten change to paragraph 2 of the escrow agreement. That provision, which previously called for the money to be deposited in the IOLTA account "if not disbursed to Seller at the initial closing," was changed to provide that "[t]he Deposit and Documents, upon delivery to the Escrow Agent, w[ould] be directly issued upon closing to Seller after approval of all documentation."

¶ 56    Drawing all reasonable inferences in Home Healthcare's favor, we conclude that Mr. Jesk met his initial burden of production on his affirmative defense. The undisputed facts—including the last-minute change in plans regarding the form the $100,000 payment would take, as well as Mr. Rivchin's conduct in signing the agreements, leaving the closing without canceling the deal, and continuing to occupy the property—all support Mr. Jesk's professed belief that no "deposit" had been made, that all conditions precedent to the deal had occurred, and that his contractual duties did not include holding any funds in escrow for the parties beyond the initial closing. Thus, if, as Home Healthcare claims, Mr. Jesk released the check for $100,000 to Ms. Sampang at the closing, his doing so did not constitute willful misconduct or gross negligence but rather coincided with his good-faith understanding of what the escrow agreement required him to do.

¶ 57    Our supreme court has recognized that a party who acts pursuant to a mistaken belief regarding what is permitted or required of that party does not act willfully. In *O'Leary v. Allphin*, 64 Ill. 2d 500, 503, 512 (1976), the director and a manager of the Illinois Department of Revenue were convicted of criminal contempt for willfully violating an injunction restraining the department from enforcing certain cigarette taxes. Our supreme court reversed the convictions, concluded that the evidence was insufficient to establish beyond a reasonable doubt that the defendants were guilty of willful violations of the court's order. *Id.* at 512-13. In the court's view, "[a] pertinent factor [to] be considered [wa]s the specificity of the injunction

order," which it preliminarily construed and concluded "was not so specific and clear as to be susceptible of only one interpretation." *Id.* at 513-14.

¶ 58    In our view, Mr. Jesk presented sufficient evidence that, even if he breached the parties' agreement, he did not do so in bad faith, through willful misconduct, or through gross negligence. Mr. Jesk's interpretation of his duties under the parties' agreement was reasonable, and certainly as reasonable as Mr. Rivchin's contention that, despite the fact that the parties signed all necessary papers and parted ways on August 12, 2010, without calling off the transaction and with Home Healthcare still occupying the property, the initial closing was never really concluded but continued on indefinitely.

¶ 59    Since Mr. Jesk met this burden of producing evidence to show his good faith and to negate a finding that he engaged in willful misconduct or gross negligence, it then fell to Home Healthcare to demonstrate a contested issue of material fact by presenting some evidence to the contrary. Although the circuit court perhaps erroneously viewed the existence of bad faith, willful misconduct, or gross negligence on Mr. Jesk's part as something Home Healthcare had the burden to plead and ultimately prove at trial—as opposed to a shifted burden of production on summary judgment—the court's conclusion that Home Healthcare presented no evidence of such conduct in opposition to summary judgment was entirely correct.

¶ 60    On appeal, Home Healthcare likewise points to no evidence of Mr. Jesk's bad faith, instead insisting that the word "willful" means nothing more than intentional and that Mr. Jesk's conduct was willful if he *intended* to hand the $100,000 check to Ms. Sampang, as opposed to accidentally allowing it to come into her possession. As an initial matter, Home Healthcare quotes only one definition of "willful" provided in Black's Law Dictionary. However, that edition, like later ones, clearly provides two opposing definitions of the word. Black's Law Dictionary (5th ed. 1979) (defining "willful" as "intentional; not accidental or involuntary," but also "to do something the law forbids, or with the specific intent to fail to do something the law requires to be done; that is to say, with bad purpose either to disobey or to disregard the law"). Moreover, Home Healthcare ignores the fact that paragraph 7 of the escrow agreement refers not to any willful act but to "willful misconduct." "[M]isconduct" is defined as "[a] dereliction of duty" or "unlawful, dishonest, or improper behavior." Black's Law Dictionary (10th ed. 2014). Home Healthcare offers no interpretation of these two words together that equates them with conduct that is simply intentional. Home Healthcare presented no evidence that, at the time of the initial closing, Mr. Jesk acted in bad faith or engaged in willful misconduct or gross negligence. There was no evidence, for example, that Mr. Jesk was told anything about the problems with Samland Healthcare that would later cause Home Healthcare to walk away from the deal and seek the return of its down payment and likewise nothing to suggest that Mr. Jesk's interpretation of what he was required to do under the parties' escrow agreement was contrived or unreasonable.

¶ 61    We conclude that summary judgment in favor of Mr. Jesk on Home Healthcare's breach of contract claim was proper.

## 3. Breach of Fiduciary Duty

¶ 63    For all of the reasons stated above, we likewise conclude that summary judgment in Mr. Jesk's favor was also warranted on Home Healthcare's breach of fiduciary duty claim. An escrow agent owes a fiduciary duty to both the purchaser and the seller in a transaction to act in accordance with escrow instructions in the parties' contract. *International Capital Corp. v.*

*Moyer*, 347 Ill. App. 3d 116, 123 (2004). The parties here agree that Home Healthcare's claims for breach of contract and breach of fiduciary duty, which are based on the same conduct, must stand or fail together.

¶ 64                                    CONCLUSION

¶ 65        For the above reasons, we affirm the circuit court's grant of summary judgment in favor of Mr. Jesk.

¶ 66        Affirmed.