FILED
April 5, 2024
Carla Bender
4th District Appellate
Court, IL

2024 IL App (4th) 230366

NO. 4-23-0366

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| FLOYD SCHULTZ, STANLEY BLUNIER, and BRAD RISKEDAL, Individually and as Class Representatives on Behalf of All of the Minority Unitholders of Illinois River Energy Holding, LLC, | ) ) ) ) | |
|      Plaintiff-Appellants and Cross-Appellees, | ) | |
|      v. | ) | |
| SINAV LIMITED; GTL RESOURCES USA, INC.; GTL RESOURCES LIMITED; GTL RESOURCES PLC; GTL CAMBRIDGE LLC; RICHARD H. RUEBE; JEFFREY W. LEMAJEUR; VINCENT J. KWASNIEWSKI; NEAL T. JAKEL; SIEM KAPITAL, AS; HARWOOD CAPITAL LLP, f/k/a North Atlantic Value LLP; and SIEM INDUSTRIES, INC., | ) ) ) ) ) ) ) | Appeal from the Circuit Court of Ogle County. No. 14L15 Honorable John C. Redington, |
|      Defendants-Appellees, | ) | Judge Presiding. |
| (Sinav Limited; GTL Resources USA, Inc.; GTL Resources Limited; GTL Resources PLC; GTL Cambridge LLC; Richard H. Ruebe; Jeffrey W. Lemajeur; Vincent J. Kwasniewski; and Neal T. Jakel, Defendants-Appellees and Cross-Appellants). | ) ) ) ) ) ) | |

JUSTICE DOHERTY delivered the judgment of the court, with opinion.
Justices Knecht and Turner concurred in the judgment and opinion.

**OPINION**

¶ 1      This class action, pending now for nearly a decade, has a complex factual and procedural history that is better understood in the context of the issues presented rather than

through an extensive chronology. We first provide a broad overview of the case and then begin our analysis of the issues, supplying additional background information as needed.

¶ 2                                             I. OVERVIEW

¶ 3            In 2007, Illinois River Energy Holdings, LLC (IREH), was formed for the purpose of operating an ethanol plant in Rochelle, Illinois. IREH's membership consisted of the plaintiff class of approximately 100 minority shareholders, who owned approximately 13% of IREH's shares (also called units), and defendant GTL Resources USA (GTL USA), which owned the remaining shares. IREH was formed under the Delaware Limited Liability Company Act (Act) (Del. Code Ann. tit. 6, § 18-101 (West 2013)), and its activities were governed by a written operating agreement (LLC Agreement). The LLC Agreement provided that IREH would be managed by a seven-person board of managers with broad authority over the company's affairs. At all times, IREH's members and managers were required to comply with any contractual duties imposed on them by the LLC Agreement and any duties imposed on them by the laws of Delaware, the state where IREH was formed and whose laws the parties agreed would govern the contract. The contract also included a waiver of the parties' right to a jury trial.

¶ 4            Perhaps unsurprisingly given the 87%-13% split in ownership, the LLC Agreement granted GTL USA the power to appoint four of the seven managers in its sole discretion, with the remaining three managers elected by the shareholders at large. The LLC Agreement also provided that majority shareholder approval was necessary for any merger and that the minority shareholders waived their dissenters' rights, including any right to prevent such a merger. On January 30, 2012, the board, with GTL USA's approval, voted 4-3 to undergo a complex restructuring called a "cash-out merger" or "squeeze-out" that enabled GTL USA to take complete control of IREH by buying out the class members' shares at $1.10 per share. The three-vote

minority consisted of plaintiffs Floyd Schultz, Stanley Blunier, and Brad Riskedal, all of whom had served on the IREH board since its founding in 2007.

¶ 5        The four-vote majority consisted of GTL USA's appointed managers at that time, defendants Richard H. Ruebe, Jeffrey W. Lemajeur, Vincent J. Kwasniewski, and Neal T. Jakel (Individual Defendants). All of the Individual Defendants had management roles at IREH; Reube, Lemajeur, and Kwasniewski also had management roles at GTL USA. Reube served on the IREH board since its founding in 2007, Lemajeur was appointed to the board by GTL USA in 2010, and Kwasniewski and Jakel were each appointed to the board by GTL USA on January 17, 2012, less than two weeks before the merger vote.

¶ 6        The merger was finalized with the Delaware Secretary of State on February 22, 2012. The company at the top of the new corporate structure was defendant Sinav Limited (Sinav), with complete ownership of IREH. Later in 2012, the Individual Defendants were offered "sweet equity" in Sinav at the market price; Reube purchased 6% of Sinav, Lemajeur purchased 2%, and Kwasniewski and Jakel each purchased 1%. Sweet equity is a kind of incentive compensation for a business's employees that serves as both carrot and stick; the employees will eventually receive a profit for selling their shares if they help to increase the value of the business, but if the value of the business declines, they will lose money on their investment.

¶ 7        In April 2014, CHS Inc. (CHS), a third-party Illinois company, announced that it would purchase Sinav. In May 2014, plaintiffs, individually and on behalf of the class of minority shareholders, filed a six-count complaint against defendants based on their roles in the cash-out merger. Plaintiffs did not join CHS as a defendant and did not seek to undo the cash-out merger or prevent CHS's impending purchase of Sinav, which went through in June 2014 at a price equivalent to $4.94 per share of IREH, after adjusting for estimated debt.

¶ 8 Plaintiffs sued GTL USA and the Individual Defendants (collectively, the IREH Defendants), alleging that all IREH Defendants breached the LLC Agreement (count I), the Individual Defendants breached common-law fiduciary duties as managers (count II), and GTL USA breached common-law fiduciary duties as the controlling shareholder (count III).

¶ 9 In deciding these counts, the trial court faced four main questions. First, the court had to determine duty; did the IREH Defendants in fact owe the class these alleged duties? Second, the court had to determine liability; did the IREH Defendants violate their duties by approving the cash-out merger? Third, the court had to determine the remedy; if the IREH Defendants were liable, what could the court do to rectify the problem? Fourth and finally, the court had to determine valuation; if the remedy involved the payment of money from the IREH Defendants to the class, what amount of money was appropriate?

¶ 10 After pretrial motion practice and bench trials in 2020 and 2022, the trial court found that (1) the IREH Defendants in fact owed the class the alleged duties; (2) the IREH Defendants breached their contractual and fiduciary duties when buying out the class; (3) the remedy would be compensatory damages, determined by subtracting $1.10 from a fair share price as of February 22, 2012, the date the merger was finalized; and (4) the fair share price was $2.78. The court calculated prejudgment interest on a compound basis and determined that the IREH Defendants were jointly and severally liable to the class for $11,966,903.15 on counts I through III. Plaintiffs appealed, and the IREH Defendants cross-appealed.

¶ 11 Plaintiffs also sued the other companies involved in the cash-out merger, alleging that they breached common-law fiduciary duties (count IV), aided and abetted the IREH Defendants' breach of their fiduciary duties (count V), and tortiously interfered with the contractual relationship between the class and the IREH Defendants by wrongfully inducing the

IREH Defendants to breach the LLC Agreement (count VI). We refer to these remaining defendants as the Tort Defendants. They fall into two categories.

¶ 12 First are the "Investor Defendants," who provided GTL USA with the funds for the cash-out merger: Siem Industries, Inc. (Siem Industries), a company based in Luxembourg; Siem Kapital, AS (Siem AS), a Norwegian company and indirect subsidiary of Siem Industries; and North Atlantic Value LLP (NAV), now known as Harwood Capital LLP, a company based in the United Kingdom.

¶ 13 Second are the "Merger Defendants," each of which had a direct corporate relationship with GTL USA. GTL Resources PLC (GTL PLC) was a publicly traded English company that owned GTL USA as its sole subsidiary. Sinav was an investment vehicle formed by the Investor Defendants in October 2011 to take GTL PLC private; Sinav is a portmanteau of Siem and NAV. GTL Resources Limited (GTL Limited) was the private company formed when Sinav purchased all of GTL PLC's publicly traded stock on January 17, 2012. GTL Cambridge LLC (GTL Cambridge) was a subsidiary of GTL USA established to merge into IREH as part of the cash-out merger.

¶ 14 Simplified greatly, Sinav had an 87% stake in IREH before the cash-out merger; after the cash-out merger, Sinav had a 100% stake. Sinav was thus a more valuable investment for the Investor Defendants if the cash-out merger went through, and the approval of the IREH Defendants was necessary for that to happen. The Merger Defendants all ultimately answered to the Investor Defendants, so they would suffer the consequences of the Investor Defendants' response to the IREH Defendants' decision, for better or worse. If the Investor Defendants or the Merger Defendants engaged in wrongful conduct to ensure the cash-out merger went through, then they could potentially be liable to the class based on that conduct.

¶ 15    In March 2015, the trial court dismissed count IV at the first step of the analysis described above, finding that none of the Tort Defendants owed any fiduciary duties to the class under Delaware law. In April 2018, the court struck plaintiffs' jury demand based on the jury-trial waiver in the LLC Agreement. After the 2022 bench trial, the court entered judgment against plaintiffs on counts V and VI. On count V, the court found that the Tort Defendants were not liable for aiding and abetting the IREH Defendants' breach of their fiduciary duties. On count VI, the court concluded that the Tort Defendants were not liable for tortious interference with contractual relations based on the IREH Defendants' breach of the LLC Agreement. Plaintiffs appealed, and the Merger Defendants cross-appealed, despite having prevailed on all counts against them.

¶ 16    In all six counts of their complaint, plaintiffs demanded "damages, including rescissory damages, to the class members in an amount to be proved up at trial to grant the plaintiffs the fair value to which they are entitled for their investment in and commitment to the Rochelle plant." We examine the concept of rescissory damages further in our discussion of remedies, but plaintiffs were essentially seeking the monetary benefits of CHS's purchase of IREH as though plaintiffs had still been shareholders in IREH at the time of the purchase. In count VI, plaintiffs further demanded "punitive damages for malicious and willful interference with the LLC Agreement." On appeal, plaintiffs challenge the trial court's November 2019 order denying them leave to amend their complaint to add a demand for disgorgement of defendants' profits to counts I through VI and a seventh count demanding a declaratory judgment voiding the cash-out merger.

¶ 17    As explained further below, we hold as follows. On count I against GTL USA for breach of contract, we reverse and enter judgment in favor of GTL USA. On count I against the Individual Defendants for breach of contract, we reverse and remand for a new trial on (1) liability for monetary damages under the LLC Agreement's exculpatory provision and (2) the amount of

- 6 -

damages for any of the Individual Defendants who are found liable. On count II against the Individual Defendants for breach of common-law fiduciary duties, we vacate the trial court's judgment as duplicative because the common-law fiduciary duties alleged in count II were supplanted by the contractual duties alleged in count I. On count III against GTL USA, we reverse and remand for a new trial on the amount of damages. On counts IV and V against the Tort Defendants, we affirm. On count VI against the Tort Defendants, we reverse and remand for a jury trial. We affirm the trial court's order denying plaintiffs leave to amend their complaint, and we dismiss the Merger Defendants' cross-appeal for lack of appellate standing. Finally, we direct the court on remand to revisit the extensive sealing of court documents in these proceedings.

¶ 18                                    II. ANALYSIS

¶ 19          We note at the outset that although the Merger Defendants joined in GTL USA's notice of cross-appeal, they were prevailing parties below, having won dismissal of count IV and judgment in their favor on counts V and VI. Accordingly, we dismiss their cross-appeal for lack of appellate standing. See *Mayster v. Santacruz*, 2020 IL App (2d) 190840, ¶ 27 ("[O]ne who has obtained by the trial court's judgment all that has been asked for cannot appeal from that judgment." (citing *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 386 (1983), and *Chicago Tribune v. College of Du Page*, 2017 IL App (2d) 160274, ¶ 28)). However, we still consider their arguments as potential grounds for upholding the trial court's judgment. See *id.* (explaining that appellees may argue in support of the judgment).

¶ 20          Furthermore, plaintiffs have not alleged any error by the trial court with respect to counts IV and V, thus forfeiting any challenge to the court's judgment on those counts. See *Lewis, Yockey & Brown, Inc. v. Fetzer*, 2022 IL App (4th) 210599, ¶ 13 (stating failure to challenge the

trial court's judgment on a given count results in forfeiture). Accordingly, we affirm as to counts IV and V.

¶ 21    On the remaining counts, we first address the issues relating to counts I through III against the IREH Defendants, including plaintiffs' proposed amendments to their complaint, and then we address count VI against the Tort Defendants.

¶ 22                    A. The IREH Defendants (Counts I Through III)

¶ 23    The parties do not dispute that Delaware law governs the substantive issues and available remedies on counts I through III because of the express choice of law provision in the LLC Agreement. See *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 351 (2002) (honoring express choice of law provision); Restatement (Second) of Conflict of Laws § 187 (1971). When interpreting and applying Delaware law, we are generally bound by the decisions of Delaware courts. *Bridgeview Health Care Center, Ltd. v. State Farm Fire & Casualty Co.*, 2014 IL 116389, ¶ 21 (holding that Illinois courts apply Delaware law as determined by the Delaware Supreme Court and the Delaware Chancery Court). Even when we apply Delaware law to the substantive issues in a given case, however, Illinois law governs "matters of pleading and how the litigation shall be conducted." *Morris B. Chapman & Associates, Ltd. v. Kitzman*, 193 Ill. 2d 560, 565 (2000) (citing *Nelson v. Hix*, 122 Ill. 2d 343, 346-47 (1988), Restatement (Second) of Conflict of Laws §§ 122, 127 (1971), and 16 Am. Jur. 2d *Conflict of Laws* §§ 153, 163 (1998)); see *Belleville Toyota*, 199 Ill. 2d at 351 (explaining that Illinois law governs procedural matters). Illinois law also determines the applicable standard of review on appeal, along with additional issues we address below. See *Kitzman*, 193 Ill. 2d at 568; *cf. Target Corp. v. Prestige Maintenance USA, Ltd.*, 2013 COA 12, ¶ 19 (applying forum law to standard of appellate review and preservation of issues for appeal).

¶ 24 We now proceed to the four questions facing the trial court: duty, liability, remedy, and valuation.

¶ 25                                                1. *Duty*

¶ 26 The inherent problem with a cash-out merger is that it creates a divergence of interests between the minority shareholders, who will either want to prevent the cash-out merger or receive the highest possible price for their shares, and the majority shareholder, who will want to pay the lowest possible price for the minority's shares. In the present case, it is undisputed that the class members waived any right to prevent a properly authorized cash-out merger, so their only remaining interest was in receiving as much as possible for their shares.

¶ 27 By default, an LLC is "member-managed," meaning that the majority shareholder is also the controlling shareholder, with actual control over the cash-out merger process and price. However, an LLC can adopt an operating agreement to become "manager-managed," giving control over the cash-out merger process and price to a putatively independent board of managers, akin to a corporation's board of directors. In the present case, the LLC Agreement created a seven-member board of managers and gave GTL USA the power to appoint four of the managers in its sole discretion. Notably, GTL USA's appointment power did not depend on whether it was the majority shareholder.

¶ 28 The question of duty requires us to interpret the LLC Agreement and Delaware law to determine who had actual control over the cash-out merger and what obligations those decision-makers owed to the class when making the decision. We review *de novo* what duties arise from a contract (*Village of Palatine v. Palatine Associates, LLC*, 2012 IL App (1st) 102707, ¶ 44) and whether a legal duty exists (*AYH Holdings, Inc. v. Avreco, Inc.*, 357 Ill. App. 3d 17, 32 (2005)). With respect to control, our review is also *de novo* because we are applying our legal conclusions

to undisputed facts. *City of Champaign v. Torres*, 214 Ill. 2d 234, 241 (2005) ("Where, as here, the question on appeal is limited to application of the law to undisputed facts, the standard of review is *de novo*.").

¶ 29       We separately address the questions of control, contractual duties, and common-law duties for GTL USA and the Individual Defendants.

¶ 30                                a. GTL USA

¶ 31                                i. *Control*

¶ 32       GTL USA asserts that it lacked "actual control" over the cash-out merger, citing section 6.1(d) of the LLC Agreement, which states:

> "Other than the right to elect Managers to the Board of Managers, no Member, other than a Member acting in his or her capacity as an officer of the Company [(IREH)], has any right or power to take part in the management or control of the Company or its business and affairs."

Under section 5.3(b)(i), "[t]he Company's Member [GTL USA] shall have the power to identify one or more Managers as a 'GTL Appointee' in the sole discretion of [GTL USA]." Four of the seven managers were designated as GTL appointees.

¶ 33       GTL USA's contention is that its control over the cash-out merger was merely indirect and extended no further than its power to appoint the majority of the board's managers, so the Individual Defendants were the only ones who wielded control to decide whether the merger would go through. We disagree.

¶ 34       When interpreting a contract under Delaware law (or Illinois law, for that matter), we do not read provisions in isolation but as parts of a whole, viewing each provision in light of the others. *Samuel J. Heyman 1981 Continuing Trust for Lazarus S. Heyman v. Ashland LLC*, 284

A.3d 714, 721 (Del. 2022); accord *Village of Kirkland v. Kirkland Properties Holdings Co.*, 2023 IL 128612, ¶ 63. Our purpose is to effectuate the contract's overall purpose and intent, starting with the contract's plain terms. *Ashland*, 284 A.3d at 721.

¶ 35 Immediately after section 6.1(d) of the LLC Agreement comes section 6.1(e), which states: "No Member shall have any voting right *except with respect to those matters requiring a Member vote or approval as specifically provided for in this Agreement or in the Act*." (Emphasis added.) If we read section 6.1(d) as eliminating this "voting right" because it is a right "[o]ther than the right to elect Managers," then section 6.1(e) becomes superfluous because the right is already eliminated. See *id.* (stating that courts must give effect to all provisions of a contract when possible). The more natural reading, which gives effect to both provisions, is that the "voting right *** with respect to those matters requiring a Member vote or approval as specifically provided for in this Agreement" is not "a[ ] right *** to take part in the management or control of the Company or its business and affairs," but merely the right to approve (or disapprove) of certain specific management decisions by the board of managers.

¶ 36 Another problem with GTL USA's interpretation is that it fails to identify any provision of the LLC Agreement that expressly *grants* the board of managers the right or power to enter into a merger once elected. Instead, section 5.1(c) of the LLC Agreement states that "the Board of Managers shall *not* have the authority to approve, authorize, or take the following actions with respect to the Company without the approval or consent of a *Majority in Interest of the Members*," including "merg[ing] or consolidat[ing] the Company with another Person." (Emphases added.) When describing this provision in its brief, GTL USA says, "the LLC Agreement expressly authorized the Board to 'merge or consolidate the Company with another Person' if it obtained the consent of the *Majority of its Members*." (Emphasis added.) In other

words, GTL USA is arguing that a merger could go through if a majority of the board, meaning four managers, approved of the merger.

¶ 37      To reject this argument, we need not go further than the definitions section of the contract, which provides specific meanings for "[c]apitalized words and phrases used in th[e] Agreement." "Majority in Interest" is defined as "Members holding more than fifty percent (50%) of the Units then held by all Members."

> " 'Member' means any Person (i) whose name is set forth as such on [the exhibit listing the founding Members] initially attached hereto or who has become a Member pursuant to the terms of this Agreement, and (ii) who is the owner of one or more Units. 'Members' means all such Persons."

GTL USA was indisputably a "Member" that owned and held more than 50% of "the Units," so it was the "Majority in Interest of the Members."

¶ 38      Therefore, contrary to GTL USA's argument, the LLC Agreement unambiguously required the approval of GTL USA *itself*, not just its appointees to the board, before the cash-out merger could go through. See *In re Coinmint, LLC*, 261 A.3d 867, 901 (Del. Ch. 2021) (interpreting similar language as requiring the "two steps" of majority member consent and formal board approval); see also *Kahn v. Lynch Communication Systems, Inc.*, 638 A.2d 1110, 1113 (Del. 1994) (holding that fiduciary duties can arise from *either* majority interest *or* exercise of *de facto* control over the business's affairs). Under Delaware law, this "ultimate decision-making power with respect to *** the [challenged merger] in particular" constituted control over the merger, even if that decision-making power did not extend to "the day-to-day, operational management of [the] business." *Lewis v. AimCo Properties, L.P.*, No. 9934-VCP, 2015 WL 557995, at *7 (Del. Ch. Feb. 10, 2015).

¶ 39        It is uncontroverted that GTL USA approved the cash-out merger in a January 30, 2012, document entitled "Action by the Majority Member of Illinois River Energy Holdings, LLC" and signed by Reube in his role as chief executive officer of GTL USA. Any claim by GTL USA that this approval was a needless formality rather than an exercise of decision-making power is plainly in error.

¶ 40        In short, we find that GTL USA had control over the cash-out merger.

¶ 41                        ii. *Contractual Duties*

¶ 42        Although GTL USA's approval was necessary for the merger to go through, that fact did not, in and of itself, impose a duty under section 5.4(a) of the LLC Agreement, which applies to "Managers," specifically defined as

> "any Person who (i) has been appointed or elected to the Board of Managers and is referred to as such in Section 5 of this Agreement or has become a Manager pursuant to the terms of this Agreement, and (ii) has not ceased to be a Manager pursuant to the terms of this Agreement."

It is undisputed that GTL USA itself was not a manager under this definition; the seven-member board of managers consisted only of plaintiffs and the Individual Defendants.

¶ 43        Plaintiffs have not pointed to any other provision of the contract that imposes a duty on GTL USA with respect to the cash-out merger, nor did the trial court identify what contractual duty GTL USA purportedly breached. In their reply brief, plaintiffs cite GTL USA's argument regarding control and assert that "[b]y acting where it claims it had no right or duty to act, GTL USA breached [section 6.1(d) of] the LLC Agreement." However, a plaintiff alleging a breach of contract must identify a "pertinent *obligation* under the agreement." (Emphasis added.) *In re P3 Health Group Holdings, LLC*, No. 2021-0518-JTL, 2022 WL 16548567, at *11 (Del. Ch. Oct. 31,

2022). While GTL USA had no *right* to act under section 6.1(d), it also had no *obligation* to refrain from acting. Moreover, plaintiffs have failed to advance a theory of vicarious liability, which Delaware generally does not recognize for breach of contract claims. See *Wenske v. Blue Bell Creameries, Inc.*, No. 2017-0699-JRS, 2018 WL 3337531, at \*16 (Del. Ch. July 6, 2018).

¶ 44 Because plaintiffs failed to allege that GTL USA had any contractual duty with respect to the cash-out merger under the LLC Agreement, we conclude that the trial court erred by finding that GTL USA breached any such duty. Accordingly, we reverse the trial court's judgment on count I against GTL USA and enter judgment in favor of GTL USA. See *Gardner v. International Shoe Co.*, 386 Ill. 418, 433 (1944) (holding that a reviewing court may reverse without remanding where no ground of recovery has been shown).

¶ 45        iii. *Common-Law Duties*

¶ 46 With respect to common-law fiduciary duties, the LLC Agreement's silence works against GTL USA; when neither the LLC Agreement nor the Act addresses the controlling shareholder's fiduciary duties, "the rules of law and equity \*\*\* relating to fiduciary duties \*\*\* shall govern." Del. Code Ann. tit. 6, § 18-1104 (West 2013); *Coinmint*, 261 A.3d at 900-01. Under Delaware law, the controlling shareholder in a cash-out merger owes the minority shareholders the default fiduciary duties of loyalty and due care. *Kelly v. Blum*, No. 4516-VCP, 2010 WL 629850, at \*10 (Del. Ch. Feb. 24, 2010). When the minority shareholders sue the controlling shareholder for breach of fiduciary duty in this situation, courts apply an exacting standard of judicial review called "entire fairness," which we explain further in our discussion of liability. *Kahn*, 638 A.2d at 1116.

¶ 47 We recognize that the pre-2013 version of the Act, effective when the LLC Agreement was executed in 2007, did not expressly mention fiduciary duties, and later *dictum*

from the Delaware Supreme Court cast some doubt on whether the pre-2013 Act imposed them. *Gatz Properties, LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1219 (Del. 2012) (*per curiam*) (*Gatz II*). However, the existence of default fiduciary duties under the pre-2013 Act had long been established as binding precedent in the Delaware Court of Chancery. *Id.*; *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 660 (Del. Ch. 2012); see Mohsen Manesh, *Damning Dictum: The Default Duty Debate in Delaware*, 39 J. Corp. L. 35, 37 (2013). The Delaware Chancery Court's interpretation of the pre-2013 Act is binding on this court (*Bridgeview*, 2014 IL 116389, ¶ 21), so we conclude that GTL USA owed the class the default fiduciary duties of loyalty and due care under Delaware law irrespective of which version of the Act governs.

¶ 48 At oral argument, counsel for GTL USA conceded that it had the right as majority shareholder to veto any cash-out merger proposed by the board but argued that it nevertheless owed no duties to the class because under the LLC Agreement, the *terms* of any merger were to be decided solely by the board. Assuming this allocation of powers reflects the proper interpretation of the LLC Agreement, it still does not change our conclusion. Under Delaware law, a fiduciary who has only the *power* to say no to a proposed transaction still has a corresponding *duty* to say no when the proposed transaction is not entirely fair. See *Kahn*, 638 A.2d at 1119-20. Accordingly, GTL USA's approval of the cash-out merger had to be consistent with its fiduciary duties of loyalty and care, irrespective of whether the Individual Defendants acted consistently with any duties of their own.

¶ 49 b. The Individual Defendants

¶ 50 i. *Control*

¶ 51    The parties do not dispute that the Individual Defendants wielded control over the cash-out merger in that the LLC Agreement required all four of their votes for the merger to go through. See *Coinmint*, 261 A.3d at 901-02. We agree.

¶ 52                        ii. *Contractual Duties*

¶ 53    As opposed to GTL USA's duties as controlling shareholder, the LLC Agreement speaks specifically to the Individual Defendants' duties as managers. Section 5.4(a) governs the managers' duties and reads as follows, with each sentence placed in a separately numbered paragraph for ease of analysis:

> "[(1)] The Board of Managers shall cause the Company [(IREH)] to conduct its business and operations separate and apart from that of any Member, Manager or any of its Affiliates.
>
> [(2)] The Board of Managers shall take all actions which may be necessary or appropriate (i) for the continuation of the Company's valid existence as a limited liability company under the Laws of the State of Delaware and each other jurisdiction in which such existence is necessary to protect the limited liability of Members or to enable the Company to conduct the business in which it is engaged, and (ii) for the accomplishment of the Company's purposes, including the acquisition, development, maintenance, preservation, and operation of Company property in accordance with the provisions of this Agreement and applicable laws and regulations.
>
> [(3)] Each Manager shall have the duty to discharge the foregoing duties in good faith, in a manner the Manager believes to be in the best interests of the

Company, and with the care an ordinarily prudent person in a like position would exercise under similar circumstances.

[(4)] No Manager shall act or fail to act in a manner that constitutes any of the following: (i) a willful failure to deal fairly with the Company or its Members in connection with a matter in which the Manager has a material conflict of interest; (ii) a violation of criminal law, unless the Manager had reasonable cause to believe that the Manager's conduct was lawful or no reasonable cause to believe that the conduct was unlawful; (iii) a transaction from which the Manager derived an improper personal profit; or (iv) willful misconduct.

[(5)] No Manager shall be under any other duty to the Company or the Members to conduct the affairs of the Company in a particular manner." (Paragraph structure and numbering added.)

Our objective is to give effect to all five sentences. *Ashland*, 284 A.3d at 721.

¶ 54          In arguing against the existence of fiduciary duties, the Individual Defendants rely on sentence five, claiming that their sole duty to the class was to avoid the conduct specifically prohibited by sentence four, which we note does not use the word "duty." We disagree with this interpretation because it eliminates the duties listed in sentence three, as well as "the foregoing duties" in sentences one and two. Moreover, sentence four's prohibition on "willful misconduct" cannot be given effect without some indication of what conduct was expected of the managers in the first place; the most straightforward conclusion is that the standard for the managers' conduct is set forth in the preceding sentences. Accordingly, we reject the Individual Defendants' interpretation and conclude that sentence five eliminates any duties, including common-law

fiduciary duties, except for those obligations established in sentences one through four. This conclusion does not end our analysis.

¶ 55    The Individual Defendants are correct that the Act permits an LLC to eliminate its managers' fiduciary duties altogether, but the Act also allows an LLC to supplant those fiduciary duties by contract, which is what happened here. See Del. Code Ann. tit. 6, § 18-1101(c) (West 2013) (providing that a manager's duties "may be expanded or restricted or eliminated by provisions in the limited liability company agreement"); *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 176 (Del. 2002) (*Gotham II*) (finding that a partnership agreement "supplanted common law fiduciary duty principles" but did not eliminate the duties). Although sentence five does eliminate the managers' common-law fiduciary duties, sentence three unambiguously provides for the "triad" of default fiduciary duties: good faith, loyalty, and due care. *MHS Capital LLC v. Goggin*, No. 2017-0449-SG, 2018 WL 2149718, at *3, *8 (Del. Ch. May 10, 2018) (finding that nearly identical contract language "spelled out" these fiduciary duties); see *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (explaining that the duty of good faith is actually a subsidiary element of the duty of loyalty). As such, this provision contractually imposed the fiduciary duties of loyalty and due care on the Individual Defendants, and along with those duties, "the contractual equivalent of the entire fairness equitable standard of conduct and judicial review." *Gatz II*, 59 A.3d at 1213; see *Gotham II*, 817 A.2d at 175 (applying a "contractually created fiduciary duty to meet the entire fairness standard").

¶ 56    The exculpatory provision in section 5.6(a) of the LLC Agreement, which eliminated the managers' personal liability "for monetary damages for a breach of fiduciary duty" except in the four circumstances identified in sentence four of section 5.4(a), reinforces our

conclusion that the Individual Defendants had fiduciary duties because this exculpatory provision restricts only the available *remedies* for a breach without eliminating the underlying *duties*, which it acknowledges exist and can be breached. *Feeley*, 62 A.3d at 664; *Metro Storage International LLC v. Harron*, 275 A.3d 810, 847 (Del. Ch. 2022). In other words, if sentence five of section 5.4(a) had eliminated the managers' contractual fiduciary duties, then all possible liability for a breach of fiduciary duty would have been eliminated along with them, making the exculpation of liability for monetary damages in section 5.6(a) superfluous. Here again, we adopt the reading that gives effect to both provisions. See *Ashland*, 284 A.3d at 721.

¶ 57 We recognize that our interpretation produces an unusual result in that the LLC Agreement effectively takes away fiduciary duties with one hand and gives them back with the other. See D. Gordon Smith, *Contractually Adopted Fiduciary Duty*, 2014 U. Ill. L. Rev. 1783, 1791 (explaining that "the notion of 'contractually adopted fiduciary duties' " is "conceptually puzzling"). As mentioned above, however, it was not established beyond doubt that the pre-2013 Act imposed common-law fiduciary duties on the managers of an LLC when the LLC Agreement was executed in 2007; as late as 2012, the Delaware Supreme Court viewed this as an issue "about which reasonable minds could differ." *Gatz II*, 59 A.3d at 1219. Sentence three of section 5.4(a) avoids the uncertainty that existed at time of IREH's formation by making the managers' fiduciary duties explicit as a matter of contract. Even if doing so had merely created uncertainty about whether sentence five eliminated the managers' common-law fiduciary duties, we would resolve that uncertainty in favor of preserving fiduciary duties. See *Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC*, No. 3658-VCS, 2009 WL 1124451, at *9 (Del. Ch. Apr. 20, 2009) (interpreting LLC agreement as preserving fiduciary duties when "the existence of fiduciary duties under [one provision] c[ould] be reconciled with [another provision's] apparent elimination of

them"); see also *Gotham II*, 817 A.2d at 168 ("[E]fforts by a fiduciary to escape a fiduciary duty \*\*\* should be scrutinized searchingly.").

¶ 58    We are not persuaded otherwise by the cases the Individual Defendants cite. In one, the LLC agreement provided, "Except as expressly set forth in this Agreement or required by law, none of the Directors, nor any other Indemnitee shall have any duties or liabilities, including fiduciary duties, to the Company or any Member." (Internal quotation marks omitted.) *In re Atlas Energy Resources, LLC*, No. 4589-VCN, 2010 WL 4273122, at \*12 (Del. Ch. Oct. 28, 2010). Even if the LLC Agreement here contained the same language—which it does not—that would not change the fact that the LLC Agreement *itself* "expressly set forth" default fiduciary duties as a matter of contract. The fact that the LLC Agreement expressly articulates fiduciary obligations also distinguishes this case from two others the Individual Defendants cite. See *Fisk Ventures, LLC v. Segal*, No. 3017-CC, 2008 WL 1961156, at \*11 (Del. Ch. May 7, 2008) (noting that the LLC agreement did not create fiduciary duties); *Dawson v. Pittco Capital Partners, L.P.*, No. 3148-VCN, 2012 WL 1564805, at \*27 (Del. Ch. Apr. 30, 2012) (same). In another case, the court found that language in a partnership agreement substituted the entire fairness standard for general partners' actions in specific situations where they had "sole and complete discretion." *Gelfman v. Weeden Investors, L.P.*, 792 A.2d 977, 987 (Del. Ch. 2001). Here, the Individual Defendants' discretion when carrying out their management duties in sentences one and two of section 5.4(a) was always cabined by their express fiduciary duties in sentence three.

¶ 59    Because the Individual Defendants had contractual fiduciary duties and were exculpated from monetary liability in certain circumstances, the proper analysis is to consider first whether the Individual Defendants are potentially liable for a breach of fiduciary duty under the entire fairness standard and then whether their potential personal liability for monetary damages

is eliminated by the exculpatory provision. See *Gatz II*, 59 A.3d at 1216 (conducting this analysis for contractual fiduciary duties under an LLC agreement).

¶ 60                                iii. *Common-Law Duties*

¶ 61          Under Delaware law, contractually adopted fiduciary duties supplant common-law fiduciary duties. *Gotham II*, 817 A.2d at 176; see *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010) ("It is a well-settled principle that where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim."). As such, a claim for a breach of contractual fiduciary duties is treated as a breach of contract claim because the relief being sought is enforcement of the contract. *Gatz II*, 59 A.3d at 1216 (reviewing a breach of fiduciary duties claim "solely on contractual grounds"). Even so, the legal analyses for breach of contractual fiduciary duties and breach of common-law fiduciary duties appear to be identical when the entire fairness standard applies. *Id.*; *Gotham II*, 817 A.2d at 175. But see *Zimmerman v. Crothall*, 62 A.3d 676, 704 (Del. Ch. 2013) (holding that entire fairness standard applied to breach of fiduciary duties set forth in an LLC agreement but suggesting that the plaintiff, rather than the defendants, may have borne the burden of proving a breach).

¶ 62          We nevertheless take our cue from the Delaware Supreme Court and review the trial court's judgment "solely on contractual grounds" while applying the entire fairness standard. *Gatz II*, 59 A.3d at 1216. Having adopted this approach, we find that plaintiffs' breach of contract claim against the Individual Defendants in count I supplants its claim for breach of common-law fiduciary duties in count II, so we vacate the trial court's judgment on count II as duplicative. See *MHS Capital*, 2018 WL 2149718, at *8 (dismissing common-law fiduciary duty claim as duplicative of contractual fiduciary duty claim); *Martin v. Illinois Central Gulf R.R.*, 237 Ill. App. 3d 910, 920 (1991) (vacating trial court's judgment on duplicative claim).

¶ 63                                    2. *Liability*

¶ 64         The question of liability requires us to consider whether the IREH Defendants breached the duties outlined above. We first address the relevant legal standard, then the parties' cross-motions for summary judgment in 2017, and finally the trial court's findings after the 2022 trial.

¶ 65                                    a. Legal Standard

¶ 66         "When determining whether a circuit court applied the incorrect legal standard, we must first ascertain the correct legal standard, which is a question of law subject to *de novo* review." *In re Marriage of Trapkus*, 2022 IL App (3d) 190631, ¶ 22.

¶ 67         The Delaware Supreme Court has explained that "the exclusive standard of judicial review in examining the propriety of an interested cash-out merger transaction by a controlling or dominating shareholder is entire fairness." *Kahn*, 638 A.2d at 1117. The court addressed the "entire fairness" standard in the definitive case on cash-out mergers as follows:

> "The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock. [Citations.] However, the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the

question is one of entire fairness." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

¶ 68    Entire fairness review applies to the controlling shareholder as well as to members of the board appointed by the controlling shareholder. See *Kahn*, 638 A.2d at 1117 (applying entire fairness to controlling shareholder); *Gesoff v. IIC Industries Inc.*, 902 A.2d 1130, 1144 (Del. Ch. 2006) (explaining that the entire fairness standard applies to controlling shareholder's appointees to the board because "the process is entirely suffused with the [controlling shareholder's] coercive power"). Stated more colorfully, the Delaware Supreme Court required entire fairness review in these circumstances because it "saw the controlling stockholder as the 800-pound gorilla whose urgent hunger for the rest of the bananas is likely to frighten less powerful primates like putatively independent directors who might well have been hand-picked by the gorilla." *In re Pure Resources, Inc., Shareholders Litigation*, 808 A.2d 421, 436 (Del. Ch. 2002). "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs." *Gesoff*, 902 A.2d at 1145; see *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 459 (Del. Ch. 2011) ("Fiduciaries need not consciously pursue self-interest.").

¶ 69    Determining which party has the burden of proof is an integral part of the entire fairness standard that has been frequently addressed in the context of cash-out mergers:

> "The initial burden of establishing entire fairness rests upon the party who stands on both sides of the transaction. [Citation.] However, an approval of the transaction by an independent committee of directors or an informed majority of minority shareholders shifts the burden of proof on the issue of fairness from the controlling

- 23 -

or dominating shareholder to the challenging shareholder-plaintiff." *Kahn*, 638 A.2d at 1117.

See *Gesoff*, 902 A.2d at 1145 ("[T]he standards for shifting the burden of entire fairness, and those factors establishing fair dealing, are highly intertwined.").

¶ 70 In the present case, there is no dispute that the cash-out merger was never approved by an independent committee of directors or an informed majority of the class. Thus, under Delaware law, the IREH Defendants bore the burden of proving entire fairness. *Gatz II*, 59 A.3d at 1216; see *Zimmerman*, 62 A.3d at 704 (noting that the burden of proof does not rest with the plaintiff "in the case of a default fiduciary duty in the LLC context"). Illinois law is in accord. See *Shlensky v. South Parkway Building Corp.*, 19 Ill. 2d 268, 282-83 (1960) (allocating burden of proving fairness to fiduciary directors rather than shareholders). As such, "[t]o demonstrate entire fairness, the [defendant] must present evidence of the cumulative manner by which it discharged *all* of its fiduciary duties." (Emphasis in original.) *Emerald Partners v. Berlin*, 787 A.2d 85, 97 (Del. 2001).

¶ 71 Furthermore, the Individual Defendants bore the burden of proving that their liability for monetary damages was exculpated under the LLC Agreement. *Auriga Capital Corp. v. Gatz Properties, LLC*, 40 A.3d 839, 858 (Del. Ch. 2012) (*Gatz I*), *aff'd*, 59 A.3d 1206 (Del. 2012); compare *Gesoff*, 902 A.2d at 1164 (describing exculpation as an affirmative defense), with *Home Healthcare of Illinois, Inc. v. Jesk*, 2017 IL App (1st) 162482, ¶ 52 (noting that an exculpatory clause may be viewed as an affirmative defense).

¶ 72 Applying the entire fairness standard to the facts of this case, GTL USA could avoid liability by proving *both* of the following: (1) the cash-out merger process was fair, and (2) the price of $1.10 per share was fair. A failure to prove either would result in liability. The Individual

Defendants could likewise avoid liability by proving both of the foregoing propositions, but a failure to prove either would not *necessarily* result in liability for the Individual Defendants; instead, the inquiry would establish the acts or omissions that constituted a breach of their fiduciary duties. Each of the Individual Defendants could then avoid liability for monetary damages by operation of the exculpatory provision in section 5.6(a) of the LLC Agreement by proving *all* of the following with respect to his own breaching acts or omissions: (1) his conduct did not constitute a willful failure to deal fairly with IREH or its shareholders in connection with a matter in which he had a material conflict of interest; (2) his conduct did not constitute a violation of criminal law, unless he had reasonable cause to believe that his conduct was lawful or no reasonable cause to believe that his conduct was unlawful; (3) he did not derive an improper personal profit from the transaction; and (4) his conduct did not constitute willful misconduct. A manager's failure to prove just one of these exceptions to exculpation would result in personal liability for that manager. See, *e.g.*, *Metro Storage*, 275 A.3d at 868 ("Although each exception to exculpation could apply, the analysis can start and end with the exception for willful misconduct.").

¶ 73                                    b. Summary Judgment

¶ 74        The trial court addressed the Individual Defendants' liability on cross-motions for summary judgment. Illinois law governs the procedures regarding summary judgment. See, *e.g.*, *Harris Trust & Savings Bank v. Joanna-Western Mills Co.*, 53 Ill. App. 3d 542, 547 (1977) (applying Illinois law governing summary judgment to the fairness of an agreement under Delaware law); see also *Kitzman*, 193 Ill. 2d at 565 (citing Restatement (Second) of Conflict of Laws §§ 122, 127 (1971) and explaining that the law of the forum governs "matters of pleading and how the litigation shall be conducted"). Our standard of review is well established:

" 'Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." ' [Citation.] We review a trial court's entry of summary judgment *de novo*. [Citation.] Further, we may affirm a lower court's ruling on a motion for summary judgment on any basis appearing in the record. [Citation.]" *Enbridge Energy, Ltd. Partnership v. Village of Romeoville*, 2020 IL App (3d) 180060, ¶ 69.

¶ 75  Where, as here, the court proceeded to trial on other issues after granting summary judgment, " 'the appellant may only refer to the record as it existed at the time the trial court ruled, outline the arguments made at that time, and explain why the trial court erred in granting summary judgment.' " *Id.* ¶ 70 (citing *Rayner Covering Systems, Inc. v. Danvers Farmers Elevator Co.*, 226 Ill. App. 3d 507, 509-10 (1992)). In other words, the availability of *de novo* review on appeal does not excuse an appellant's failure to put its best foot forward at the relevant time in the trial court. Accordingly, we disregard the Individual Defendants' arguments to the extent they rely on their later testimony at trial.

¶ 76  As explained above, the Individual Defendants would have had the burden of proving at trial that the cash-out merger was entirely fair by "present[ing] evidence of the cumulative manner by which [they] discharged all of [their] fiduciary duties." (Emphasis omitted.) *Emerald Partners*, 787 A.2d at 97. The Individual Defendants could therefore establish entire fairness at the summary judgment stage only by showing that there was no genuine dispute of material fact as to fair dealing and fair price and that they provided the class with both. See *Willett v. Cessna Aircraft Co.*, 366 Ill. App. 3d 360, 372 (2006) (requiring defendant to satisfy summary judgment standard when defendant would have borne the burden of proof at trial). Critically, the

Individual Defendants could not secure summary judgment against plaintiffs by challenging the *sufficiency* of plaintiffs' evidence regarding fair dealing and fair price; plaintiffs needed only to supply enough evidence to show a genuine dispute of material fact.

¶ 77 Plaintiffs, for their part, could secure summary judgment against the Individual Defendants on the issue of entire fairness either by showing that (1) there was no genuine dispute of material fact as to either fair dealing or fair price and plaintiffs were entitled to judgment as a matter of law or (2) the Individual Defendants' evidence was insufficient to avoid judgment in plaintiffs' favor as a matter of law, that is, they failed to make a *prima facie* case of entire fairness. *Jiotis v. Burr Ridge Park District*, 2014 IL App (2d) 121293, ¶ 25. Plaintiffs argued both with respect to fair dealing; with respect to fair price, plaintiffs argued that there was a genuine issue of material fact and that the trial court should proceed to a trial on damages. Our focus is on the court's decision to grant plaintiffs' motion.

¶ 78 When asked to make their *prima facie* case of fair dealing, the Individual Defendants argued first that plaintiffs improperly sought a bifurcated inquiry into fair dealing and fair price in violation of *Weinberger*, 457 A.2d at 711, which requires consideration of all aspects of entire fairness. Although there is some merit to this contention given the importance of a unitary inquiry, Delaware courts have nevertheless found a lack of fair dealing sufficient on its own to establish liability. See, *e.g.*, *Kahn v. Tremont Corp.*, 694 A.2d 422, 432 (Del. 1997) ("[T]he process [wa]s so intertwined with price that under *Weinberger*'s unitary standard[,] a finding that the price *** might have been fair [would] not save the result."); *Merritt v. Colonial Foods, Inc.*, 505 A.2d 757, 766 (Del. Ch. 1986) (failure to prove fair dealing alone established liability); see also *In re Tesla Motors, Inc. Stockholder Litigation*, 298 A.3d 667, 718 (Del. 2023) (explaining that under the entire fairness analysis, fiduciaries cannot "hide behind the price").

¶ 79     However, when an exculpatory provision is involved, the court cannot simply declare that the transaction was the product of unfair dealing and hold the managers liable; it must "articulate the basis upon which it decides the ultimate question of entire fairness" so that it can then determine whether the managers' conduct was exculpated. *Emerald Partners*, 787 A.2d at 98. That is, the court must decide what exactly the Individual Defendants did wrong before it can decide whether that wrongdoing subjected them to liability for monetary damages. See *In re Cornerstone Therapeutics Inc., Stockholder Litigation*, 115 A.3d 1173, 1186 (Del. 2015) (noting that exculpation "was best determined after a trial, because the substantive fairness inquiry would shed light on why the directors acted as they did"). In the context of personal liability in the corporate context, Delaware courts "have emphasized that each director has a right to be considered individually when the directors face claims for damages in a suit challenging board action." *Id.* at 1182.

¶ 80     Furthermore, the inquiries into fair dealing and exculpation are slightly different. Under the entire fairness standard, courts are unconcerned with a board member's subjective mental state because "the transaction *** must be objectively fair, independent of the board's beliefs." *Gesoff*, 902 A.2d at 1145. In contrast, when determining whether the Individual Defendants are exculpated under this LLC Agreement, the trial court must consider questions like whether each defendant's conduct was willful and whether his conflicts of interest, if any, were material to his decisions. See *Dawson*, 2012 WL 1564805, at *32 ("[W]hen intentional misconduct or bad faith is the standard at issue, *** some showing of the requisite mental state is necessary for the defendant to be liable; mere participation in a self-dealing, unfair transaction is not enough, without a showing of the requisite mental state."); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1167 (Del. 1995) (holding that trial courts must apply an "actual person" test rather than a

"reasonable director" test when considering materiality). The manager's credibility is often central to this analysis. See *Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 107 (Del. 2013) ("[O]bjective factors may inform an analysis of a defendant's subjective belief to the extent they bear on the defendant's credibility when asserting that belief."). Questions of intent and motive are not well suited to summary determination (*Beaman v. Freesmeyer*, 2021 IL 125617, ¶ 149), and the court may not evaluate credibility at the summary judgment stage (*Coole v. Central Area Recycling*, 384 Ill. App. 3d 390, 396 (2008); see *Allen*, 72 A.3d at 107 (holding that ultimate inquiry into subjective good faith under partnership agreement "must focus on the subjective belief of the specific directors accused of wrongful conduct")).

¶ 81        Plaintiffs' motion for summary judgment and the Individual Defendants' response do not address the correct legal framework regarding the Individual Defendants' liability, and the trial court's approach was also off the mark. On appeal, we can nevertheless attempt to salvage the trial court's decision if it "is correct on the merits, *** particularly if a retrial would result in the same disposition." *Goff v. Teachers' Retirement System of Illinois*, 305 Ill. App. 3d 190, 196 (1999). With respect to entire fairness overall, any error in granting summary judgment was harmless because the Individual Defendants subsequently had a full and fair opportunity to litigate the fairness of the price at the 2020 trial and failed to establish that a price of $1.10 was fair. Thus, no amount of fair dealing could have rendered the transaction entirely fair. See *In re Emerging Communications, Inc. Shareholders Litigation*, No. Civ.A. 16415, 2004 WL 1305745, at *28 (Del. Ch. May 3, 2004); see also *Tesla Motors*, 298 A.3d at 734 (finding no reversible error when lower court's entire fairness analysis was not "pitch perfect").

¶ 82        However, we cannot conclude that the trial court's failure to conduct an analysis of each Individual Defendant's mental state was harmless. Although the Individual Defendants did

not address their subjective mental states in their response to plaintiffs' motion for summary judgment, any attempt to do so would have been premature because exculpation may be addressed only after a transaction is determined not to be entirely fair. *Emerald Partners*, 787 A.2d at 94, 98-99. The trial court should therefore have allowed the Individual Defendants an opportunity to pursue this affirmative defense before finding them liable. See *Reverse Mortgage Funding, LLC v. Catchins*, 2023 IL App (1st) 221197, ¶ 28 (finding error when the trial court "deprived the defendants of a fair opportunity to properly frame their defense" by simultaneously holding them liable at summary judgment and striking their defense). Accordingly, we reverse the trial court's finding of liability at the summary judgment stage and remand for a trial on the question of exculpation.

¶ 83    To guide the trial court on remand, we briefly address the parties' arguments regarding the first exception to exculpation for "a willful failure to deal fairly with the Company or its Members in connection with a matter in which the Manager has a material conflict of interest." We initially agree with the Individual Defendants that materiality must be determined by examining each manager's subjective decision-making process. *Cinerama*, 663 A.2d at 1167.

¶ 84    On the other hand, the Individual Defendants set the bar for a conflict of interest far too high, asserting that they had no conflict of interest because they were not *certain* to be offered sweet equity in Sinav until after the merger vote. The Delaware Supreme Court defined conflicts of interest in a similar context as follows:

> "A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders. [Citations.] Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the

stockholders. In such circumstances, a director cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision." *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993).

At oral argument, counsel for the Individual Defendants pointed out that the Individual Defendants' alleged certainty in receiving sweet equity in Sinav formed the basis of the trial court's decision to find them liable at the summary judgment stage. We have rejected the court's suggestion that only benefits certain to be received can create a conflict of interest; on remand, the trial court may still consider the loss of a possible financial opportunity as part of its conflict analysis.

¶ 85                                c. The 2022 Trial

¶ 86        The trial court determined GTL USA's liability for breach of fiduciary duty at a bench trial in 2022.

> "When a trial court sits without a jury, appellate courts will not disturb its findings of fact unless they are against the manifest weight of the evidence. [Citation.] A finding is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent or when the findings are unreasonable, arbitrary, or not based on the evidence." *In re Marriage of Hundley*, 2019 IL App (4th) 180380, ¶ 48.

¶ 87        GTL USA's sole challenge to the trial court's finding of liability on count III is to argue that GTL USA lacked actual control over the decision and thus had no common-law fiduciary duties with respect to the cash-out merger, an argument we have just rejected. GTL USA's assertion that it took no action in breach of its duties is contradicted by the exhibits

introduced at trial, which feature numerous references to GTL USA's approval of the cash-out merger.

¶ 88    Our review of the trial record shows there is ample evidence to support a finding that GTL USA failed to adequately "present evidence of the cumulative manner by which it discharged *all* of its fiduciary duties" to ensure the class members received a fair process and a fair price in the cash-out merger. (Emphasis in original.) *Emerald Partners*, 787 A.2d at 97. Although the trial court erroneously allocated the burden of proof to plaintiffs, the error was harmless because plaintiffs were still able to establish their case by a preponderance of the evidence. See *People v. Bilyew*, 73 Ill. 2d 294, 300 (1978) ("[A]llocation of the burden of proof becomes significant in a given case only when the evidence is so nicely balanced that neither [side's case] is established by a preponderance of the evidence."). In the absence of any additional argument, we conclude that the court's finding that GTL USA was liable for breach of fiduciary duty is not against the manifest weight of the evidence.

¶ 89                            3. *Remedy*

¶ 90    The question of remedy requires us to examine how the trial court could remedy the IREH Defendants' breach of their duties. We separately address (1) damages and rescissory damages, which plaintiffs sought in their complaint; (2) disgorgement and a declaratory judgment that the cash-out merger was void, which plaintiffs attempted to seek in their proposed amended complaint; and (3) compound interest, which the court awarded on plaintiffs' claims against the IREH Defendants.

¶ 91                    a. Damages and Rescissory Damages

¶ 92    Because plaintiffs' claim for breach of common-law fiduciary duties against GTL USA is an equitable claim, the trial court had broad discretion to craft "any form of equitable and

monetary relief as may be appropriate." *Weinberger*, 457 A.2d at 714. Furthermore, the LLC Agreement did not limit the available remedies for breach of contract, other than the exculpatory provision discussed above, so the court had the same broad discretion to craft a remedy for plaintiffs' breach of contract claim against the Individual Defendants who were not exculpated. See *Gotham II*, 817 A.2d at 175.

¶ 93    The ordinary remedy for a breach of fiduciary duties in the context of a cash-out merger involves a "quasi-appraisal," where the trial court determines the fair value of the business at the time of the merger and awards the plaintiffs their proportionate share, subtracting the amount they already received in the unfair transaction. See *Weinberger*, 457 A.2d at 714. This remedy, which plaintiffs received in the present case, is effectively an award of compensatory damages because the "fair value" is roughly equivalent to the "fair price" that would have been paid in an entirely fair transaction. See *Tesla Motors*, 298 A.3d at 717 (noting that the economic inquiries for fair price and fair value are intended to be equivalent).

¶ 94    However, " '[t]he fair price aspect of the entire fairness test *** is not in itself a remedial calculation.' " *Id.* (quoting *ACP Master, Ltd. v. Sprint Corp.*, Nos. 8508-VCL, 9042-VCL, 2017 WL 3421142, at *18 (Del. Ch. July 21, 2017), *aff'd mem.*, 184 A.3d 1291 (Del. 2018)). The trial court may award "rescissory damages" when compensatory damages are inadequate to remedy the defendants' wrongdoing, "particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved." *Weinberger*, 457 A.2d at 714. Rescissory damages are intended to be the economic equivalent of rescission, a remedy usually employed to unwind a transaction that should never have gone through. See *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 372 (Del. 1993), *modified*, 636 A.2d 956 (Del. 1994). Rescissory damages are especially appropriate if "it is apparent that [a] long

completed transaction is too involved to undo." *Weinberger*, 457 A.2d at 714. When awarding rescissory damages, the court determines the value of the business at some point *after* the merger, based on the assumption that if the merger had not gone through, the minority shareholders would have sold their shares at the most profitable time; the court then awards the plaintiffs their proportionate share of that value, subtracting the amount they already received in the unfair transaction.

¶ 95    Therefore, a decision not to award rescissory damages is essentially a conclusion that the plaintiffs have an adequate remedy at law in the form of compensatory damages. See *CC Disposal, Inc. v. Veolia ES Valley View Landfill, Inc.*, 406 Ill. App. 3d 783, 788 (2010) ("If a party's injury can be adequately compensated through money damages, it has an adequate remedy at law."). We would ordinarily review this decision for an abuse of discretion. *Id.*; see *People v. Chambers*, 2016 IL 117911, ¶ 75 (noting that an exercise of a trial court's equitable powers is subject to review for abuse of discretion). However, the trial court here prevented plaintiffs from litigating the possibility of rescissory damages by granting the IREH Defendants' motion for summary judgment on the issue. See 735 ILCS 5/2-1005 (West 2022) (providing that findings in an order granting summary determination of an issue "shall be deemed established" at trial). As such, our standard of review is *de novo*. *Seymour v. Collins*, 2015 IL 118432, ¶ 49. The summary judgment record must be construed liberally in favor of plaintiffs and strictly against the IREH Defendants, and the IREH Defendants' right to judgment on the issue of rescissory damages must be clear and free from doubt. *Id.* We consider the IREH Defendants' motion anew and perform the same analysis a trial court would. *Davis v. Pace Suburban Bus Division of the Regional Transportation Authority*, 2021 IL App (1st) 200519, ¶ 31.

¶ 96    The IREH Defendants' first argument is that there is no evidence of egregious misconduct. This argument fails at the outset because egregious misconduct is not a condition precedent to an award of rescissory damages; they are available whenever "the board puts its conflicting personal interests ahead of the interests of the shareholders." *Strassburger v. Earley*, 752 A.2d 557, 581 (Del. Ch. 2000). The IREH Defendants go on to say that the undisputed evidence showed that the Individual Defendants "kept Plaintiffs informed throughout the process" and "w[ere] not conflicted." According to the undisputed evidence, however, plaintiffs were not informed of the full terms of the buyout until 10 days before the IREH board meeting on January 30, 2012, and they were prevented from tabling the merger vote at that meeting to permit them to discuss the terms with other class members before the board approved the merger. Reading the summary judgment record in the light most favorable to plaintiffs, as we must in this posture (see *Seymour*, 2015 IL 118432, ¶ 49), the record supports an inference that the Individual Defendants were aware they would be offered sweet equity in Sinav before the merger vote and were offered sweet equity in Sinav on February 17, 2012, five days before the merger was finalized. Even if egregious misconduct were required to obtain rescissory damages, reasonable minds could differ as to whether this conduct qualified, making the issue ill-suited for resolution at the summary judgment stage. *Davis*, 2021 IL App (1st) 200519, ¶ 24 ("If a reasonable person could draw competing inferences from the facts, summary judgment should be denied.").

¶ 97    With respect to the excessiveness of the delay, the IREH Defendants argue that the plaintiffs intentionally sat back and waited to see if the market improved. As the Individual Defendants have pointed out elsewhere, however, matters of intent are generally not suitable for determination at the summary judgment stage. *Beaman*, 2021 IL 125617, ¶ 149. Moreover, the inquiry into excessive delay is not one-sided; if the IREH Defendants are found responsible, then

they should not benefit from the delay at plaintiffs' expense. See *In re Orchard Enterprises, Inc. Stockholder Litigation*, 88 A.3d 1, 41 (Del. Ch. 2014).

¶ 98    Because genuine issues of material fact existed, the trial court erred by precluding rescissory damages at the summary judgment stage and must exercise its discretion on remand to determine whether they are appropriate, considering the relevant evidence admitted at a new trial. Without limiting the court's discretion, we do note two concerns with the court's prior analysis.

¶ 99    First, the inquiry into delay is not identical for rescission and rescissory damages "because the passage of time may be what renders rescission impractical and requires the deployment of rescissory damages as the functional equivalent." See *id.* In precluding rescissory damages, the trial court based its reasoning on a case in which only rescission was sought. See *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 795 A.2d 1, 36 (Del. Ch. 2001) (*Gotham I*), *aff'd in part, rev'd in part*, 817 A.2d 160 (Del. 2002); *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 855 A.2d 1059, 1072 (Del. Ch. 2003) (*Gotham III*) (noting that rescissory damages had not been sought in *Gotham I*), *aff'd mem.*, 840 A.2d 641 (Del. 2003).

¶ 100    Second, the trial court should consider the extent to which plaintiffs' delay was truly excessive. Plaintiffs filed suit promptly after CHS announced it was purchasing Sinav and before the terms of that transaction were finalized. Even true rescission might not have been out of the question at that point, had plaintiffs sought it, and the terms of the sale to CHS are easily susceptible of proof. To the extent that plaintiffs' delay resulted in some unfairness to the IREH Defendants, that finding must be weighed against any finding that the IREH Defendants failed to act fairly toward plaintiffs in the first place. See *Reis*, 28 A.3d at 466 (noting that the scope of recovery for a breach of fiduciary duties should not be determined narrowly).

¶ 101    Nevertheless, we emphasize that the trial court's ultimate choice of remedy will not be disturbed as long as it is reasonable.

¶ 102                    b. Disgorgement and Declaratory Judgment

¶ 103    Plaintiffs did not seek disgorgement or a declaratory judgment in their initial complaint in May 2014; instead, they moved for leave to seek these remedies in a proposed amended complaint filed in June 2018. The trial court denied the motion in November 2019. When a trial court denies a motion for leave to file an amended complaint, we review its decision for an abuse of discretion, considering the four *Loyola* factors: " '(1) whether the proposed amendment would cure the defective pleading; (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading could be identified.' " *Devyn Corp. v. City of Bloomington*, 2015 IL App (4th) 140819, ¶ 89 (quoting *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992)). We will not reverse unless the plaintiff shows that the trial court incorrectly weighed all four factors. *Id.* ¶ 100 (citing *I.C.S. Illinois, Inc. v. Waste Management of Illinois, Inc.*, 403 Ill. App. 3d 211, 220 (2010)).

¶ 104    Plaintiffs spend very little time on this argument in their opening brief and recognize in their reply brief that they "focused upon the two material and applicable *Loyola* factors—lack of prejudice and timeliness." Even so, with respect to the declaratory judgment, we find that the trial court did not abuse its discretion. Plaintiffs sought purely monetary relief in their 2014 complaint, even though the full panoply of equitable remedies might have been available. Moreover, plaintiffs moved for summary judgment to void the cash-out merger in 2017; they provide no reason why a motion for leave to amend could not have been filed at the same time. Allowing plaintiffs to amend their complaint after four years could also have caused serious

prejudice to CHS, which purchased Sinav after plaintiffs filed their complaint. The trial court properly considered whether this result would serve the ends of justice. See *Kolacki v. Verink*, 384 Ill. App. 3d 674, 680 (2008); 735 ILCS 5/2-616 (West 2022) ("[A]mendments may be allowed on just and reasonable terms.").

¶ 105 With respect to disgorgement, our conclusion that the trial court must consider rescissory damages on remand renders any alleged error harmless. See *Orchard Enterprises*, 88 A.3d at 38-39 (explaining that a court may consider disgorgement of profits when measuring rescissory damages).

¶ 106 c. Prejudgment Interest

¶ 107 Because the trial court chose a monetary remedy, it also had the equitable discretion to award prejudgment interest on a compound basis. See *Gotham II*, 817 A.2d at 173. We review the trial court's decision to award equitable interest for an abuse of discretion. *In re Estate of Wernick*, 127 Ill. 2d 61, 87 (1989).

¶ 108 GTL USA does not argue that the trial court lacked the discretion to award compound interest, but it argues that remand is required for the court to explicitly state the grounds for its award of compound interest. See *David J. Stone Co. v. Silverstein*, No. 298, 1998, ¶ 20 (Del. Apr. 1, 1999) (order). Under our standard of review for discretionary determinations, however, the trial court does not need to make a formal statement of reasons as long as it supplies "a record adequate to allow meaningful review of its exercise of discretion." *People v. Ortega*, 209 Ill. 2d 354, 360 (2004); see, *e.g.*, *Martin v. Heinold Commodities, Inc.*, 240 Ill. App. 3d 536, 545 (1992) (affirming award of equitable compound interest based on a review of the record), *aff'd in part, rev'd in part on other grounds*, 163 Ill. 2d 33 (1994). To simplify matters, we nevertheless urge

the trial court on remand to explain its reasoning if it determines that compound interest is appropriate.

¶ 109                                    4. *Valuation*

¶ 110          Finally, we turn to the question of valuation. In light of our conclusion that the trial court improperly eliminated the possibility of rescissory damages at the summary judgment stage, we must vacate its award of compensatory damages. If the court on remand concludes that compensatory damages remain the appropriate remedy, it should nevertheless consider the evidence pertinent to rescissory damages when determining the fair value of IREH. See *Weinberger*, 457 A.2d at 714 (holding that a fair value determination may incorporate elements of rescissory damages that are susceptible of proof). We briefly address some of the parties' arguments that may recur on remand.

¶ 111          We will not set aside a trial court's fair value determination unless it is against the manifest weight of the evidence. *Brynwood Co. v. Schweisberger*, 393 Ill. App. 3d 339, 354 (2009) (citing *Weigel Broadcasting Co. v. Smith*, 289 Ill. App. 3d 602, 607 (1996)). "A decision is said to be against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the finding is unreasonable, arbitrary, or not based on the evidence presented." *Id.*

¶ 112          The Individual Defendants argue that the trial court erred by ignoring the £1 per share that Sinav paid for the public shares of GTL PLC on January 17, 2012. However, the court did not ignore this information but emphasized that the amount (approximately $1.61 per share) may not have represented IREH's true value because "[i]nformation and insight not communicated to the market may not be reflected in stock prices." (Internal quotation marks omitted.) *Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 301 (Del. 1996). The Individual Defendants argue that market prices are superior to the discounted cash flow model the court used, but the cases they cite

involved appraisal proceedings under a dissenters' rights statute. *DFC Global Corp. v. Muirfield Value Partners, L.P.*, 172 A.3d 346 (Del. 2017); *Union Illinois 1995 Investment Ltd. Partnership v. Union Financial Group, Ltd.*, 847 A.2d 340 (Del. Ch. 2003). The quasi-appraisal remedy envisioned by *Weinberger* for a breach of fiduciary duty is not identical to a statutory appraisal. See *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1187-88 (Del. 1988) (noting "this clear distinction in terms of the relief available"). Even in a statutory appraisal, however, courts cannot rely exclusively on market value. *Rapid-American Corp. v. Harris*, 603 A.2d 796, 806 (Del. 1992).

¶ 113    Plaintiffs assert that the trial court erred in conducting its discounted cash flow analysis by choosing different data points from each expert and using an unsupported weighted average cost of capital rate. Although these concerns are now moot, we emphasize that mathematical certainty is not required when a trial court assesses damages; the court need only arrive at a responsible estimate of damages based on a reasoned analysis of the evidence. See *Reis*, 28 A.3d at 466. Indeed, there is no perfect formula to produce the fair value of a business, which "is not a point on a line, but a range of reasonable values, and the judge's task is to assign one particular value within this range as the most reasonable value in light of all of the relevant evidence and based on considerations of fairness." *Cede & Co. v. Technicolor, Inc.*, No. Civ.A. 7129, 2003 WL 23700218, at *2 (Del. Ch. Dec. 31, 2003), *aff'd in part, rev'd in part*, 884 A.2d 26 (Del. 2005).

¶ 114    Finally, GTL USA argues that the trial court should have appointed a neutral expert to resolve the disparity between the experts' testimony, citing cases from Delaware. However, evidentiary matters in Illinois courts are governed by Illinois law. Restatement (Second) of Conflict of Laws § 138 (1971); *Ford v. Newman*, 77 Ill. 2d 335, 338 (1979); *cf. Tumlinson v. Advanced Micro Devices, Inc.*, 106 A.3d 983, 989 (Del. 2013) (applying Delaware's procedural

law regarding expert opinion testimony to case governed by Texas's substantive law). GTL USA cites no case in which an Illinois court has appointed a neutral valuation expert, and even the Delaware case GTL USA cites in support of its argument recognized that "no Delaware Court ha[d] ever appointed a neutral expert witness upon its own initiative" at that time. *In re Shell Oil Co.*, 607 A.2d 1213, 1222 (Del. 1992). In encouraging the practice, the Delaware Supreme Court adopted procedures similar to Rule 706 of the Federal Rules of Evidence (Fed. R. Evid. 706) on the unusual basis that "the spirit and purpose of the federal rules have always been within the inherent power of our courts." *Shell Oil*, 607 A.2d at 1222. The Delaware Supreme Court supplanted this inherent power with an explicit rule in 1999. See *Cede & Co. v. Technicolor, Inc.*, 758 A.2d 485, 497 (Del. 2000). Although we offer no opinion as to whether Illinois courts have a similar inherent power, we note that adversarial testing is the norm. See *Stevenson v. Windmoeller & Hoelscher Corp.*, 39 F.4th 466, 471 (7th Cir. 2022) (recognizing this encroachment on the adversary system); see also *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 665 (7th Cir. 2002) (noting that federal courts rarely appoint neutral expert witnesses).

¶ 115                                       5. *Remand*

¶ 116        Having found reversible error in the trial court's entry of summary judgment against (1) the Individual Defendants for breach of contractual fiduciary duties and (2) plaintiffs on the issue of rescissory damages, we must remand for a new trial on count I against the Individual Defendants and count III against GTL USA. We must also determine the scope of the new trial on remand.

¶ 117        With respect to the Individual Defendants, the trial court must conduct the exculpation analysis laid out above, with the burden of proof on each of the Individual Defendants to show that none of the exceptions to exculpation applies to his conduct in breach of his fiduciary

duties. With respect to GTL USA and any nonexculpated Individual Defendants, the court must exercise its discretion to determine whether compensatory or rescissory damages are appropriate based on the evidence. If the court finds that compensatory damages remain appropriate, it should nevertheless consider the evidence pertinent to rescissory damages as part of its overall fair value analysis. If the court decides that prejudgment interest should be determined on a compound basis, it should explain its reasons for reaching that decision. Because the court's prior decisions on these issues have been reversed, they do not constitute the law of the case. *Underwood v. City of Chicago*, 2020 IL App (1st) 182180, ¶ 38 (noting that the law-of-the-case doctrine applies only to *unreversed* decisions). Rather, the trial court must proceed in conformity with this court's mandate, including the specific directions and views set forth in this opinion. *Clemons v. Mechanical Devices Co.*, 202 Ill. 2d 344, 352 (2002).

¶ 118                    B. Plaintiffs' Jury Demand (Count VI)

¶ 119          Plaintiffs argue that the trial court erred by striking their jury demand on the tortious interference with contract claim (count VI) based on the jury trial waiver in the LLC Agreement. Plaintiffs applied for leave to appeal the trial court's decision to strike their jury demand pursuant to Illinois Supreme Court Rule 308 (eff. Oct. 1, 2019), but this court declined to allow the appeal. *Schultz v. Sinav Ltd.*, No. 2-21-0479 (2021) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 120          We review the trial court's decision to strike plaintiffs' jury demand *de novo* because it involves three subsidiary questions, each calling for *de novo* review: (1) whether the trial court properly selected, interpreted, and applied Illinois's choice of law principles as embodied in the Second Restatement of Conflict of Laws (*Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 154 (2007)), (2) whether plaintiffs have the right to a jury trial on this claim

(*Catania v. Local 4250/5050 of the Communications Workers of America*, 359 Ill. App. 3d 718, 722 (2005)), and (3) whether the trial court properly interpreted the contractual jury waiver (*Carr v. Gateway, Inc.*, 241 Ill. 2d 15, 20 (2011)).

¶ 121                                    1. *The Second Restatement*

¶ 122        Plaintiffs assert that Illinois law governs their right to a jury trial because the substantive claim sounds in tort, whereas the Tort Defendants assert that Delaware law governs because the substantive claim is dependent on the contract and thus falls under the LLC Agreement's Delaware choice of law provision.

¶ 123        The purpose of a choice of law analysis is for the forum court to determine which state's substantive law, also called its "local law," governs a particular issue in a case with some connection to another state. If the states' local laws are in "actual conflict," meaning that the forum state's local law and the other state's local law call for conflicting results, the court must determine which state's local law to apply to the issue. See *Bridgeview*, 2014 IL 116389, ¶ 24. The supreme court has "stress[ed] that a choice-of-law analysis begins by isolating the issue and defining the conflict." *Townsend*, 227 Ill. 2d at 155. Here the issue is twofold: did plaintiffs have the right to a jury trial on their claim of tortious interference with contract and, if so, did they waive that right through the contractual jury waiver in the LLC Agreement? The parties assert generally that a conflict exists on this issue.

¶ 124        Despite making extensive arguments, the parties have overlooked what is an uncharacteristically straightforward choice of law principle: "The local law of the forum determines whether an issue shall be tried by the court or by a jury." Restatement (Second) of Conflict of Laws § 129 (1971). "As used in the [Second Restatement], the 'local law' of a state is the body of standards, principles and rules, *exclusive of its rules of Conflict of Laws*, which the

- 43 -

courts of that state apply in the decision of controversies brought before them." (Emphasis added.) *Id.* § 4(1). Thus, while the Second Restatement generally requires a complex balancing of various states' interests (see *id.* §§ 6, 186-188), this is one of "the relatively few areas for which it provides clear rules," and the rule calls for the application of Illinois's local law. *Townsend*, 227 Ill. 2d at 158; see *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 62 (2007) (emphasizing the value of the black letter statements in the Second Restatement); see also *Vanier v. Ponsoldt*, 833 P.2d 949, 960 (Kan. 1992) (recognizing that section 129 of the Second Restatement (Restatement (Second) of Conflict of Laws § 129 (1971)) reflects black letter law).

¶ 125 Accordingly, we must determine as a matter of Illinois's local law whether plaintiffs' claim invokes the right to a jury trial under the Illinois Constitution and whether plaintiffs remain entitled to a jury trial notwithstanding the contractual jury waiver in the LLC Agreement. Restatement (Second) of Conflict of Laws § 129, cmt. a (1971) ("The local law of the forum determines whether a party is entitled to a jury trial on any aspect of his case."). We must examine how Illinois courts interpret contractual jury waivers in any case, not just when those waivers appear in contracts stipulating to the application of Delaware law. See *id.* § 122, cmt. a ("The forum is more concerned with how its judicial machinery functions and how its court processes are administered than is any other state.").

¶ 126        2. *The Right to a Jury Trial*

¶ 127 The parties dispute whether plaintiffs in fact had the right to a jury trial on this claim; if not, the jury demand was ineffective and the trial court could not have erred by striking it. Civil litigants in Illinois courts have the constitutional right to a jury trial, as that right was enjoyed before the adoption of the Illinois Constitution in 1970. Ill. Const. 1970, art. I, § 13; *People*

*ex rel. Daley v. Joyce*, 126 Ill. 2d 209, 215 (1988); see *Stephens v. Kasten*, 383 Ill. 127, 132 (1943) (pointing out that the right to a trial by jury applies to *litigants*).

¶ 128　　We conclude that litigants in Illinois courts ordinarily have the right to a jury trial on claims of tortious interference with contract, given that litigants enjoyed jury trials on these claims long before 1970. See, *e.g.*, *Doremus v. Hennessy*, 176 Ill. 608, 612-13, 617 (1898) (*Doremus II*); *Morehouse v. Terrill*, 111 Ill. App. 460, 462 (1903). This conclusion is consistent with the broader principle that tort victims had the right to a trial by jury at common law; " 'an action *in personam* to recover damages for tort [wa]s one of the most familiar of the common-law remedies.' " *Bowman v. American River Transportation Co.*, 217 Ill. 2d 75, 97 (2005) (quoting *Panama R.R. Co. v. Vasquez*, 271 U.S. 557, 561 (1926)).

¶ 129　　Although a breach of contract is necessarily involved in the tort, the cause of action arises not from the contract itself but from the defendant's common-law duty not to wrongfully interfere with another person's right to enter into lawful contracts. *Meadowmoor Dairies, Inc. v. Milk Wagon Drivers' Union of Chicago No. 753*, 371 Ill. 377, 382 (1939), *aff'd*, 312 U.S. 287 (1941). The defendant can breach this duty even in the absence of an enforceable contract by preventing the plaintiff from entering into a contract in the first place, a principle that was established well before 1970. *Herman v. Prudence Mutual Casualty Co.*, 41 Ill. 2d 468, 472-73 (1969) (collecting cases and citing Restatement (First) of Torts § 766 (1939)).

¶ 130　　Although equitable remedies are available in an appropriate case (see *Meadowmoor Dairies*, 371 Ill. at 391), tortious interference with contract is nevertheless "a tort cause of action for damages." *Loewenthal Securities Co. v. White Paving Co.*, 351 Ill. 285, 299 (1932); *Doremus v. Hennessy*, 62 Ill. App. 391, 400 (1895) (*Doremus I*) (describing wrongful interference with contract as an "action[ ] in tort," where "the question of the extent of damages is almost exclusively

for the jury"), *aff'd*, 176 Ill. 608 (1898). In this respect, tortious interference with contract differs from a breach of fiduciary duty, an equitable action to which the right to a jury trial has never attached. Compare *Koehler v. The Packer Group, Inc.*, 2016 IL App (1st) 142767, ¶¶ 62-65 (applying principles of tort law to tortious interference with contract claim), with *Capitol Indemnity Corp. v. Stewart Smith Intermediaries, Inc.*, 229 Ill. App. 3d 119, 124 (1992) ("[B]reach of fiduciary duty is not a tort; rather, it is controlled by the substantive laws of agency, contract and equity.").

¶ 131    Our conclusion does not turn on whether plaintiffs' claim is governed by the local law of Delaware or Illinois. First and foremost, Illinois litigants historically enjoyed the right to a trial by jury as a matter of "remedy," even when their substantive rights were determined by the laws of another jurisdiction. See, *e.g.*, *Mexican Central Ry. Co. v. Gehr*, 66 Ill. App. 173, 194 (1896) (noting that "[Illinois] law has provided that the jury shall decide the question" of compensation for a tort claim under Mexican law); *Chicago & Northwestern Ry. Co. v. Tuite*, 44 Ill. App. 535, 541 (1892) (Gary, J., specially concurring, joined by Shepard, J.) ("The functions of court and jury, and the rules of pleading and evidence, when a case is tried in a court of this State, are regulated by the law of this State."); see also *Chicago & Eastern Illinois R.R. Co. v. Rouse*, 178 Ill. 132, 137 (1899) (explaining that "all that pertains merely to the remedy will be controlled by the law of the State where the action is brought" in both tort and contract cases (emphasis omitted)).

¶ 132    Moreover, the Tort Defendants have not met their burden of demonstrating that Delaware law regarding tortious interference with contract actually conflicts with Illinois law, and in the absence of an actual conflict, Illinois courts will apply Illinois law. *Bridgeview*, 2014 IL 116389, ¶¶ 24-26 (explaining that the party seeking application of another state's local law has the

burden of demonstrating an actual rather than potential conflict). In fact, the Tort Defendants conceded before the trial court that Illinois law and Delaware law call for identical analyses, which the case law bears out. Compare *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 154-55 (1989) (setting out the elements of the tort under Illinois law), with *Bhole, Inc. v. Shore Investments, Inc.*, 67 A.3d 444, 453 (Del. 2013) (setting out the elements of the tort under Delaware law). This suggests that a distinction between plaintiffs with claims under Illinois law and plaintiffs with identical claims under Delaware law would be arbitrary, although we need not resolve such unraised issues here. See *Sturges & Burn Manufacturing Co. v. Pastel*, 301 Ill. 253, 255 (1921) ("[E]very citizen has an equal right with every other to resort to the courts of justice for the settlement and enforcement of his rights, and *** discrimination between different classes of litigants which is merely arbitrary in its nature is a denial of that right and of the equal protection of the law."); *cf. Hughes v. Fetter*, 341 U.S. 609, 612 (1951) (finding that Wisconsin violated the full faith and credit clause (U.S. Const., art. IV, § 1) by refusing to entertain wrongful death actions under Illinois law when its courts would entertain wrongful death actions under Wisconsin law).

¶ 133                                  3. *The Contractual Jury Waiver*

¶ 134            Accordingly, the inquiry now turns to whether plaintiffs contractually waived their right to a jury trial through the LLC Agreement. We again emphasize that Illinois contract law and public policy govern this question despite the Delaware choice of law provision in the contract. When deciding questions of Illinois contract law, we are not bound by the decisions of federal courts, but "we may look to federal decisions for guidance and adopt their reasoning if we find it persuasive." *Findlay v. Chicago Title Insurance Co.*, 2022 IL App (1st) 210889, ¶ 63.

¶ 135                                  a. The Applicable Standard

¶ 136　　　　Although the right to a jury trial is fundamental, it can be forfeited or waived, including by a party's conduct. *Installco, Inc. v. Whiting Corp.*, 336 Ill. App. 3d 776, 786 (2002). However, when a party avoids forfeiture by asserting its right to a jury trial in accordance with the necessary procedures, as plaintiffs did here, the party "cannot be deprived of that right by any act of the adverse party or the trial court without an actual waiver." *Themas v. Green's Tap, Inc.*, 2014 IL App (2d) 140023, ¶ 8. "A waiver is an intentional relinquishment of a known right." *Puglisi v. Hansford*, 193 Ill. App. 3d 803, 807 (1990).

¶ 137　　　　The Illinois Supreme Court has not opined on contractual jury waivers in general, but the court has explained that "it is axiomatic that a party may waive the right to a trial by jury in a civil case by entering into a contract to arbitrate." *Carter v. SSC Odin Operating Co.*, 237 Ill. 2d 30, 49 (2010) (*Carter I*); see *Melena v. Anheuser-Busch, Inc.*, 219 Ill. 2d 135, 150 (2006) (referring to "the usual maxim of contract law that a party to an agreement is charged with knowledge of and assent to the agreement signed"). Waiver of the right to a jury trial is an inherent part of an arbitration agreement, but such an agreement involves much more, such as a waiver of the right to appeal. Consequently, where an agreement to arbitrate would be valid, surely one of its components—an agreement to waive a jury trial—would be as well.

¶ 138　　　　When faced with a similar situation involving jury trial waivers governed by Illinois contract law and the constitutional right to a jury trial in federal cases (U.S. Const., amend. VII), the Seventh Circuit and the Northern District of Illinois concluded that the contractual jury waivers should be examined under ordinary principles of Illinois contract law rather than through a heightened examination of the contracting party's subjective mental state. *IFC Credit Corp. v. United Business & Industrial Federal Credit Union*, 512 F.3d 989, 994 (7th Cir. 2008); *JF Enterprises, LLC v. Fifth Third Bank*, 824 F. Supp. 2d 818, 824-25 (N.D. Ill. 2011). These courts

recognized that "[a]n agreement to a bench trial cannot logically be treated less favorably than an agreement to arbitrate—an agreement that surrenders more rights." *JF Enterprises*, 824 F. Supp. 2d at 824 (citing *IFC Credit*, 512 F.3d at 994).

¶ 139      We find the reasoning in these decisions persuasive and conclude that the same analysis is appropriate when the right to a jury trial originates from the Illinois Constitution as opposed to the United States Constitution. As the court in *JF Enterprises* noted, the Illinois Supreme Court rejected a more demanding subjective standard for jury trial waivers in the form of arbitration agreements. *Id.* (citing *Melena*, 219 Ill. 2d 135). The supreme court in *Carter I*, 237 Ill. 2d at 49-50, adhered to the view that ordinary principles of contract law apply to arbitration agreements, albeit with the purpose of placing those contracts on equal footing with "all contracts generally," as required by the Federal Arbitration Act (9 U.S.C. § 1 *et seq.* (2000)). The court noted that its decision still "preserve[d] general contract defenses such as lack of mutuality, lack of consideration, fraud, duress, unconscionability, and the like, that can truly apply to any contract." *Carter I*, 237 Ill. 2d at 50. We conclude that these same principles of contract law, including the availability of general contract defenses to challenge the knowing and voluntary nature of the waiver, are adequate to protect the contracting parties' constitutional right to a jury trial even when the contractual jury waiver does not take the form of an arbitration agreement.

¶ 140                    b. Enforcing the Contractual Jury Waiver

¶ 141      Returning to basic principles, a contractual jury waiver is essentially a promise by the contracting party not to pursue a jury trial, assuming, of course, that a jury trial is an available option in the forum. See *Chicago, Rock Island & Pacific Ry. Co. v. Cole*, 251 U.S. 54, 56 (1919) (explaining that states may do away with juries altogether). The parties here have assumed that such a promise can be enforced through a motion to strike the jury demand from plaintiffs'

complaint, and we agree. See *Stephens*, 383 Ill. at 135 (reviewing a trial court's decision to strike a jury demand based on waiver); *JF Enterprises*, 824 F. Supp. 2d at 825 (granting a motion to strike a jury demand based on a contractual jury waiver). Plaintiffs argue, however, that the Tort Defendants lacked the right to seek enforcement of the contractual jury waiver.

¶ 142        It is worth stepping back for a moment to think about what the Tort Defendants did here. They were alleged to have wrongfully induced the IREH Defendants to breach their contract with plaintiffs and the class, but they nevertheless sought to enforce plaintiffs' promise to the IREH Defendants, in that very same contract, not to pursue a jury trial. Suppose the shoe were on the other foot and plaintiffs sought to strike a proper jury demand by the Tort Defendants pursuant to the contractual jury waiver. The Tort Defendants could fairly assert that they were not parties to the LLC Agreement and thus made no promise to waive their right to a jury trial under the Illinois Constitution. See *Themas*, 2014 IL App (2d) 140023, ¶ 8 (holding that the unilateral act of an adverse party cannot waive a party's right to a jury trial); *cf. Selzer v. Dunkin' Donuts, Inc.*, No. 09-5484, 2014 WL 1340549 (E.D. Pa. Apr. 4, 2014) (declining to enforce contractual jury waiver against nonsignatories) Therefore, under the Tort Defendants' view of the situation, plaintiffs surrendered to them, *the alleged tortfeasors*, the unilateral right to choose whether *plaintiffs themselves* would receive a jury trial or a bench trial. Worse still, plaintiffs could not escape this result by approaching the Tort Defendants to seek a mutual revocation of the contractual jury waiver because the Tort Defendants were not parties to the LLC Agreement; plaintiffs' right to a jury trial would thus be at the mercy of the IREH Defendants as well, on a claim to which those defendants were not even parties.

¶ 143        The supreme court found a similar proposition untenable in *Bowman*, espousing the following view:

" 'It is nothing short of astonishing to suggest that—in a forum in which jury trials are generally available at the request of either party—one party would have a unilateral right to choose between a jury and a bench trial. Such a unilateral right would be unprecedented in law *** and contrary to basic notions of even-handed procedural fairness.' " *Bowman*, 217 Ill. 2d at 98 (quoting David W. Robertson & Michael F. Sturley, *Understanding Panama Railroad Co. v. Johnson: The Supreme Court's Interpretation of the Seaman's Elections Under the Jones Act*, 14 U.S.F. Mar. L.J. 229, 268 (2001-02)).

We decline to endorse the similarly astonishing suggestion that a trial court could deny a litigant its constitutional right to a jury trial at the request of a complete stranger to a contractual jury waiver. We hold that a party moving to strike an otherwise proper jury demand on the basis of a contractual jury waiver must first show that it has standing to enforce the waiver as a party or direct beneficiary. An alternative approach would encourage a litigant favoring bench trials to seek out any contractual jury waiver signed by another litigant and argue it has some connection to the case, however tenuous.

¶ 144     We further disagree with the Tort Defendants that the problem of enforcement is overcome by the sweeping language of the contractual jury waiver, which provides, "Each of the Members irrevocably waives to the extent permitted by law, all rights to trial by jury and all rights to immunity by sovereignty or otherwise in any action, proceeding or counterclaim arising out of or relating to this Agreement." However, "[t]here is a strong presumption against conferring benefits to noncontracting third parties." *Barry v. St. Mary's Hospital Decatur*, 2016 IL App (4th) 150961, ¶ 82. " 'In order to overcome that presumption, the implication that the contract applies to third parties must be so strong as to be practically an express declaration.' " (Internal quotation

marks omitted.) *Id.* (quoting *F.H. Paschen/S.N. Nielsen, Inc. v. Burnham Station, L.L.C.*, 372 Ill. App. 3d 89, 96 (2007)). Here, the LLC Agreement lacks the extremely clear language necessary to overcome that presumption; on the contrary, the LLC Agreement states that its provisions "shall be binding upon and inure to the benefit of the Members and their respective successors, transferees, and assigns." Construing the sweeping language of the contractual jury waiver as including tortious interference with contract claims would only benefit *nonmembers* because a party cannot tortiously interfere with its own contract. *Koehler*, 2016 IL App (1st) 142767, ¶ 43. We cannot conclude that IREH's members intended to grant third-party tortfeasors the unilateral right to deny them a jury trial.

¶ 145     Likewise unavailing is the Tort Defendants' argument that plaintiffs are equitably estopped from denying that the contractual jury waiver applies to their claim. Under this theory, plaintiffs would have to accept the burden of a bench trial because they have accepted the benefits of the LLC Agreement. See *Grot v. First Bank of Schaumburg*, 292 Ill. App. 3d 88, 93 (1997) ("A party that accepts the benefits of an agreement is estopped from *** performing obligations under the agreement."). The Tort Defendants analogize their theory to the concept of arbitration by estoppel, under which "non-signatory plaintiffs may be estopped from refusing to arbitrate if their claims 'depend[ ] upon, or [are] inextricably intertwined with' the contractual obligations of the contract containing the arbitration clause." *Peterson v. Devita*, 2023 IL App (1st) 230356, ¶ 45 (quoting *Jensen v. U-Haul Co. of California*, 18 Cal. App. 5th 295, 306 (2017)).

¶ 146     However, the Illinois Supreme Court has squarely rejected the theory of arbitration by estoppel, stating that "under basic principles of contract law, only parties to the arbitration contract may compel arbitration or be compelled to arbitrate." *Carter v. SSC Odin Operating Co.*, 2012 IL 113204, ¶ 55 (*Carter II*). The court emphasized that these principles of Illinois common

law govern all contracts, not just arbitration agreements, because an order compelling arbitration is an enforcement of the parties' bargain to arbitrate. *Id.* ¶ 60. Here, the trial court's order striking plaintiffs' jury demand was proper only if it constituted the enforcement of some bargained-for obligation. See *Grot*, 292 Ill. App. 3d at 93 (noting that equitable estoppel applies to contractual *obligations*). There was no bargain between plaintiffs and the Tort Defendants, so the trial court erred by striking plaintiffs' jury demand.

¶ 147                                    4. *Remand*

¶ 148          Because the trial court erroneously denied plaintiffs their right to a jury trial on count VI, we must reverse and remand for a jury trial on this count. *Bowman*, 217 Ill. 2d at 98. When trying the remaining issues on counts I through III on remand, the trial court must preserve plaintiffs' right to a jury trial on count VI. See Ill. S. Ct. R. 232 (eff. Jan. 1, 1967) (governing trial of legal and equitable matters). In light of this disposition, plaintiffs' challenges to the trial court's evidentiary rulings are moot and may be raised at the new trial, if necessary. See *Bowman*, 217 Ill. 2d at 98.

¶ 149                              C. Sealing of Records

¶ 150          As a final matter, we note that extensive portions of the record in this case are impounded—meaning sealed from public view—even though the public has a presumptive right of access to these records. *In re Marriage of Johnson*, 232 Ill. App. 3d 1068, 1074-75 (1992) ("The file of a court case is a public record to which the people and the press have a right of access. *** Once documents are subject to the right of access, only a compelling reason, accompanied by specific factual findings, can justify keeping them from public view."). The record on appeal does not disclose why the records were sealed, so we presume the trial court acted within its discretion in sealing them. See *Skolnick v. Altheimer & Gray*, 191 Ill. 2d 214, 231 (2000) (noting that the

decision to seal court records is discretionary); *Bicek v. Quitter*, 38 Ill. App. 3d 1027, 1030 (1976) ("It is well settled that there is no presumption of abuse of discretion by a trial court ***.").

¶ 151    Nevertheless, the trial court on remand must revisit whether the party or parties seeking to seal these documents have met the heavy burden necessary to warrant the continued restriction on public access; absent such a showing, the documents must be unsealed. See *Skolnick*, 191 Ill. 2d 214 (explaining what the party opposing public access must show); see also *Marriage of Johnson*, 232 Ill. App. 3d at 1075 ("The parties' desire and agreement that the court records were to be sealed falls far short of outweighing the public's right of access to the files."). The parties' agreement on sealing cannot be the end of the trial court's scrutiny because the strong presumption in favor of open access cannot be so easily overcome. The court must satisfy itself that it has a proper basis for sealing and that the extent of the sealing goes no further than is necessary to serve the interest which justifies it, regardless of what the parties may agree to.

¶ 152                                  III. CONCLUSION

¶ 153    For the reasons stated, the cross-appeal by defendants Sinav, GTL PLC, GTL Limited, and GTL Cambridge is dismissed, and the trial court's order denying plaintiffs leave to amend their complaint is affirmed. On count I against GTL USA, we reverse and enter judgment in favor of GTL USA. On count I against defendants Reube, Lemajeur, Kwasniewski, and Jakel, we reverse and remand for a new trial on (1) liability for monetary damages under the LLC Agreement's exculpatory provision and (2) the amount of damages for any of these defendants who are found liable. On count II against defendants Reube, Lemajeur, Kwasniewski, and Jakel, we vacate the trial court's judgment as duplicative of its judgment on count I. On count III against defendant GTL USA, we reverse and remand for a new trial on the amount of damages. On counts IV and V against defendants Sinav, GTL PLC, GTL Limited, GTL Cambridge, Siem Industries,

Siem AS, and NAV, we affirm. On count VI against defendants Sinav, GTL PLC, GTL Limited, GTL Cambridge, Siem Industries, Siem AS, and NAV, we reverse and remand for a jury trial. Further proceedings shall be consistent with this opinion.

¶ 154 Affirmed in part, reversed in part, dismissed in part, and vacated in part; cause remanded with directions.

*Schultz v. Sinav Ltd.*, 2024 IL App (4th) 230366

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Ogle County, No. 2014-L-15; the Hon. John C. Redington, Judge, presiding. |

| | |
|---|---|
| **Attorneys for Appellant:** | Terrence P. Canade, Keith D. Parr, and Hugh S. Balsam, of Locke Lord LLP, of Chicago, for appellants. |

| | |
|---|---|
| **Attorneys for Appellee:** | Paul E. Chadwick, of Fearer Nye & Chadwick, of Rochelle, and Charles K. Maier (*pro hac vice*), Brian A. Dillon (*pro hac vice*), Richard C. Landon (*pro hac vice*), and Brooke F. Robbins (*pro hac vice*), of Lathrop GPM LLP, of Minneapolis, Minnesota, for appellees Sinav Limited, GTL Resources USA, Inc., GTL Resources Limited, GTL Resources PLC, and GTL Cambridge LLC. |
| | Thomas K. Cauley Jr., of Cauley Law Group LLC, of Hinsdale, and Joseph R. Dosch and Stephen Spector, of Sidley Austin LLP, of Chicago, for appellees Richard H. Ruebe and Jeffrey W. Lemajeur. |
| | Marcos Reilly, of Hinshaw & Culbertson LLP, of Chicago, for appellees Vincent J. Kwasniewski and Neal T. Jakel. |
| | Monte L. Mann, Joshua E. Liebman, and Ian P. Flanagan, of Armstrong Teasdale LLP, of Chicago, for other appellees. |